**STATE of Tennessee, Plaintiff/Appellee,**

v.

**Donald Ray MIDDLEBROOKS,
Defendant/Appellant.**

Supreme Court of Tennessee,
at Nashville.

Sept. 8, 1992.

---

Lionel R. Barrett, Jr., Richard McGee, Paul G. Whetstone, Nashville, for defendant-appellant.

Charles W. Burson, Atty. Gen. & Reporter and Kathy M. Principe, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

## OPINION

ANDERSON, Justice.

In this capital case, the defendant, Donald Ray Middlebrooks, was found guilty of first-degree felony murder and aggravated kidnapping, but found not guilty of premeditated first-degree murder, armed robbery, and aggravated sexual battery. In the sentencing hearing, the jury found two aggravating circumstances: (1) that the murder was heinous, atrocious or cruel in that it involved torture; and (2) that it was committed while defendant was engaged in committing a felony. Tenn.Code Ann.

§ 39–2–203(i)(5) and (7) (1982). The jury found the aggravating circumstances sufficiently substantial to outweigh the mitigating circumstances and sentenced the defendant to death by electrocution. The defendant was also sentenced to 60 years for aggravated kidnapping.

On appeal, the defendant raises numerous issues for our review, which involve alleged errors occurring at trial in both the guilt and sentencing phases. We have carefully considered the defendant's contentions as to the guilt phase and find no error. We, therefore, affirm the defendant's guilt.[1] With respect to the sentence, we wish to address an issue not directly raised by the parties—the constitutionality of the death penalty as punishment for felony murder. A majority of the Court—Justices Anderson, Drowota, and O'Brien—conclude that it is constitutional under both the state and federal constitutions to impose the death penalty for felony murder under Tennessee's death penalty statute. Justices Daughtrey and Reid dissent. A majority of the Court—Justices Anderson, Daughtrey, and Reid—have determined, however, that the statute as applied in this case does not sufficiently narrow the population of death-eligible felony murder defendants under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution, because the aggravating circumstance set forth in Tenn.Code Ann. § 39–2–203(i)(7) (1982), that the defendant was engaged in committing a felony, essentially duplicates the elements of the offense of first-degree felony murder set out in Tenn.Code Ann. § 39–2–202(a) (1982) and ·Tenn.Code Ann. § 39–2–202(a)(1) (Supp.1988). Justices Drowota and O'Brien dissent.

As a result of this determination and because the jury has found two aggravating circumstances are supported by the evidence beyond a reasonable doubt, it is necessary for this case to be remanded for resentencing. Although the evidence amply supports the aggravating circumstance found by the jury that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn.Code Ann. § 39–2–203(i)(5), we are unable to conclude that the elimination of the other aggravating circumstance (i)(7) from jury consideration is harmless error beyond a reasonable doubt. We, therefore, reverse the sentence on the grounds that the aggravating circumstance set out in Tenn.Code Ann. § 39–2–203(i)(7) is unconstitutionally applied under the Eighth Amendment to the U.S. Constitution and Article I, § 16 of the Tennessee Constitution where the death penalty is imposed for felony murder, and remand this case for a resentencing hearing, in which the State will be free to reseek the death penalty if it so desires.

Under our holding today, felony murder continues as a death-eligible offense. It requires, however, a finding of one of the eleven other aggravating circumstances other than the duplicative circumstance of Tenn.Code Ann. § 39–2–203(i)(7).

## FACTUAL BACKGROUND

The State's proof introduced at the guilt phase of the trial demonstrated that on the evening of Sunday, April 26, 1987, around 7:00 p.m., the victim, Kerrick Majors, a 14–year–old black male, was with four friends on Gallatin Road in East Nashville, Tennessee, when they saw a table with a "lot of stuff" being set up across the street as a flea market by three homeless street persons: the defendant, Donald Middlebrooks (a 24–year–old white male); his wife, 17–year–old Tammy Middlebrooks; and their companion, 16–year–old Roger Brewington. The five boys ran across Gallatin Road and were looking at the flea market when Tam-

---

1. This Opinion has been divided into three parts for easier reference. The three parts are: Part I, "Guilt Phase—Trial Errors," found on page 326 of the Opinion; Part II, "Constitutionality of the Death Penalty for Felony Murder," found on page 335 of the Opinion; and Part III, "Sentencing Phase—Constitutional Application of Aggravating Circumstances," found on page 341 of the Opinion. All Justices concur in Part I of the Opinion. Justices Anderson, Drowota, and O'Brien concur in Part II of the Opinion, and Justices Reid and Daughtrey dissent. Justices Anderson, Daughtrey, and Reid concur in Part III of the Opinion, and Justices O'Brien and Drowota dissent.

my Middlebrooks called out, "Hey, leave our stuff alone!" The boys started running. The defendant and Brewington chased them until they caught Majors. Brewington grabbed Majors in a "sleeper hold" around his neck and head. The defendant held his hand. When Majors said, "Hey man, you know me," Brewington responded, "Shut up, you nigger." Shannon Stewart and another of the boys, Tony Watson, saw the two men drag Majors toward the table and observed the defendant strike him in the face, knocking him to the ground. Frightened, the boys took off running. Later that evening, they reported these events to the victim's mother, who called the police.

The next afternoon, Kerrick Majors' nude body was discovered lying face up in a dry creek bed under a foam mattress in a heavily wooded area behind a drugstore on Gallatin Road in the area where the defendant and Brewington had caught Majors. A bloodstained T-shirt was tied around his neck. A red rope belt was tied around Majors' left wrist, and there was a two-inch laceration in his right wrist. Abrasions, swelling, and bruising were present on the victim's head, his left eye, his nose, his lips, and inside his mouth. An "X" with a vertical line running through it had been cut into his chest. The forensic pathologist, Dr. Charles Harlan, testified that these incisions had been made while Majors was alive. There were two deep stab wounds in the center of the body. One of these penetrated the left lung and pulmonary artery and caused the victim to bleed to death over a period of ten to thirty minutes, during part of which Majors was conscious. Investigating officers noticed a smell of urine about the face, and there were bruises and skinned areas on the back. A wooden stick with blood stains on one end was found lying close to the victim's head.

Around 1:10 a.m. on April 28, police investigators met Brewington at a doughnut shop several miles from the Gallatin Road area. Brewington directed the officers to the location of a knife with a brass knuckle handle, which was bloodstained. Dr. Harlan testified that this knife could have inflicted the deep stab wounds on the victim's body. Brewington also directed the police to a wooded area between Gallatin Road and Ellington Parkway in Nashville where, around 7:00 a.m. on April 28, Donald and Tammy Middlebrooks were apprehended at a small plywood shack. The defendant, who resisted the arresting officers, had a knife with him. He was arrested with the aid of police dogs, taken to the hospital for treatment of the dog bites, and later transported to police headquarters.

At 12:30 p.m. that day, the defendant gave a lengthy video-taped statement about his involvement in the death of Kerrick Majors. The defendant admitted participating in the beating and mistreatment of Majors, but described his role as minor and depicted Roger Brewington as the primary perpetrator of the offense. After Majors was caught, Middlebrooks said Brewington suggested they "have some fun," and the three of them took Majors back into the woods. His hands were tied. Brewington slapped him, beat him with the knife's brass knuckles, hit him with a stick, and urinated into his mouth. The defendant admitted striking Majors with his open hand and on the leg with a switch. Defendant said that his wife Tammy had slapped Majors and burned Majors' nose with a cigarette lighter as Brewington urged her on. Brewington hit Majors on his testicles, threatened to cut "it" open, stuck a stick up Majors' anus, hit him some more with the brass knuckles, wiped the victim's blood on himself, beat his mouth and tongue with a stick, dropped the knife on him, gagged him, and slashed his wrist. Finally, when the defendant asked Brewington to stop because the victim's crying and pleading were getting on his nerves, Brewington gave the victim "the kiss of death" on the forehead. Brewington then gave the defendant the knife and told him to stab Majors. When the defendant refused, Brewington stabbed Majors. The defendant then reluctantly stabbed the victim, according to him, "to prove to Roger that I guess I was cooler" and to put Majors out of his misery. In a previous statement, however, the defendant had said that he had stabbed Majors twice. The

victim's ordeal began at 7:30 p.m. and ended at 11:00 p.m. that night with the stabbing.

The next day, the defendant said he and Brewington went back to where they had left the body. Brewington kicked it and made the "X" lacerations at this time. The defendant said he then covered Majors with a foam mattress. The defendant admitted that before beating and killing Majors, he and Brewington had drunk alcohol and smoked marijuana.

The defendant presented no proof.

Based on this evidence, the jury found the defendant guilty of first-degree murder in the perpetration of a felony and aggravated kidnapping, but not guilty of premeditated first-degree murder, armed robbery, or aggravated sexual battery.

In the sentencing phase of the trial, the state incorporated the evidence presented at the guilt phase and introduced photographs of the victim's body and of Roger Brewington. The defendant's main theory was that he was mentally ill and that infliction of prolonged torture like that perpetrated on the victim was inconsistent with his personality. His younger half-sister, Sharon Fuchs, described their deprived and unstable childhood growing up in Texas. According to her, the defendant's father had died when he was four, and he had been subjected to mistreatment by his mother's husbands and boyfriends. The crucial change in his personality, however, had occurred after he was sodomized in his early teens by an adult male cousin who had been baby-sitting him and his sister. After that, his grades dropped at school, he began to run away from home, and becoming emotionally disturbed, was committed to the Waco State Home for Children but ran away from that institution. Eventually, defendant was imprisoned for his role in stealing a combine. While confined, he was stabbed in the head with an ice pick. He then began having grand mal seizures. The defendant had a history of admissions to mental hospitals and mental health facilities in Texas. His sister described him as passive and nonviolent and related how they had been cared for by a black woman, whom the defendant had loved. She said her brother had had black friends and was not a racist.

In Fuchs' cross-examination, the state introduced a document written by Middlebrooks entitled "Debow's Revenge," in which the defendant listed Texas law enforcement officers upon whom he planned vengeance for their offenses against him. In a section called "Justified Death Plan," the defendant described the tortures he intended to inflict upon these persons. Fuchs explained that the document was written after the defendant had been released in May 1986 from the Austin State Hospital, where he had been undergoing psychiatric treatment, and testified that her brother had never acted on the threats in the document.

Dr. Jay Woodman, a clinical psychologist, also testified that he had interviewed, tested, and evaluated the defendant. He diagnosed the defendant as suffering from a severe borderline personality disorder, with a secondary diagnosis of an adjustment disorder with depressed mood, malingering, polysubstance abuse, antisocial personality disorder, and a seizure disorder by history. Dr. Woodman described the defendant as a passive follower, impulsive, and unable to engage in inflicting torture for any protracted period of time. Dr. Woodman said the defendant's intelligence was in the low-average category, and that he had reviewed "Debow's Revenge" and thought that it was consistent with the fantasies generated by the intense inner-personal anger of someone suffering from a borderline personality disorder. Dr. Woodman felt that with the proper medication, the defendant could behave in the structured environment of a prison if given a life sentence.

Based on the proof, the jury found the existence of two aggravating circumstances beyond a reasonable doubt. The jury found that (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn.Code Ann. § 39-2-203(i)(5) (1982), and that (2) the murder was committed while the defendant was engaged in committing

a felony, Tenn.Code Ann. § 39–2–203(i)(7) (1982). In addition, the jury found that the two aggravating circumstances outweighed the mitigating circumstances. As a result, the jury sentenced the defendant to death.

## PART I.

### GUILT PHASE—TRIAL ERRORS

#### A. Motion To Suppress Confession

The first issue raised on this appeal is whether the trial court correctly overruled the defendant's motion to suppress his taped confession. The defendant contends that his taped confession is inadmissible under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and Article I, § 9 of the Tennessee Constitution, because he did not knowingly and voluntarily waive his rights. The defendant argues that the confession was involuntary because: (1) he was not adequately apprised of his rights, (2) the circumstances surrounding his arrest, his low educational level, and his mental illness made it difficult for him to understand his rights, and (3) the police did not take the defendant before a magistrate "without unnecessary delay" as required by Tenn.R.Crim.P. 5(a). We find no merit to this argument.

The Fifth Amendment to the U.S. Constitution, which is applicable to the states through the Fourteenth Amendment, see *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), gives an accused the right not to be "compelled in any criminal case to be a witness against himself." The Sixth Amendment to the U.S. Constitution, which is also applicable to the states through the Fourteenth Amendment, see *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), gives an accused in all criminal prosecutions "the right ... to have the assistance of counsel for his defense." Under the corresponding provisions of the Tennessee Constitution, "the accused hath the right to be heard by himself and his counsel ... and shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9.

Although the right to counsel and the right against self-incrimination are consti-tutional rights, they may be waived provided the waiver is made "voluntarily, knowingly, and intelligently." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). *See also State v. Smith,* 834 S.W.2d 915 (Tenn.1992). In determining whether a confession has been made knowingly and voluntarily, courts must look to the totality of the circumstances. *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222, 238 (1985); *State v. Kelly,* 603 S.W.2d 726, 728–29 (Tenn.1980).

Before there can be a voluntary and knowing waiver, "the accused must be adequately and effectively apprised of his rights." *Miranda, supra,* 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719; *Smith, supra,* 834 S.W.2d at 918. At a minimum, the accused must be warned that he has the right to remain silent, that any statement made may be used as evidence against him, and that he has the right to have an attorney, whether retained or appointed, present during questioning. *Miranda, supra,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706; *Smith, supra,* 834 S.W.2d at 918.

■ The first argument made by the defendant is that his taped confession was involuntary, because he was not adequately advised of his rights. The evidence presented at the hearing on the motion to suppress, however, demonstrates that the defendant was more than adequately advised of his rights.

The defendant was advised of his *Miranda* rights three times before he gave the taped confession. The first was at the time of his arrest, when he was being escorted to a patrol car from the wooded area where he was apprehended. Although he was complaining about the dog bites at that time, the defendant acknowledged that he understood his rights. The second time was shortly after he was placed in a patrol car to be transported to the hospital. When he started to say something to the transporting officer, he was immediately advised of his rights and once again acknowledged that he understood them.

The third and final time the defendant was advised of his rights was shortly before the taped confession, after he had been treated and released from the hospital. After being advised for the third time, the defendant acknowledged that he understood his rights and waived them by signing the waiver of rights form read to him by Detective Pridemore. Moreover, after signing the waiver form, the defendant had one hour to think about his rights and decide whether to confess while the officers were taking the statement of Tammy Middlebrooks. During this hour, the defendant was permitted to eat a snack, drink a soda, and smoke a cigarette.

■ Although he had been advised of his rights three times, the defendant contends that the circumstances surrounding his arrest, particularly the dog bites, prevented him from understanding his rights. In addition, Middlebrooks contends that his low educational level and his mental illness prevented him from understanding his constitutional rights.

In *State v. Workman*, 667 S.W.2d 44 (Tenn.1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984), this Court addressed a similar argument in the context of a confession challenged on the basis that the defendant was in no condition to waive his rights as a result of pain from dog bites and a blow to the head. In rejecting this argument, the *Workman* court found that the defendant suffered "no material injury," and as a result, he was alert and oriented when he was advised of his rights. *Id.*, 667 S.W.2d at 48.

As in *Workman*, we find that the defendant suffered no material injury affecting his ability to understand his *Miranda* rights. The evidence presented at the suppression hearing demonstrates that Middlebrooks was alert and oriented every time he was advised of his rights.

■ With respect to the argument that his education level and mental illness prohibited him from understanding his rights, we find no evidence in the transcript of the motion to suppress to support such a contention. Although there is evidence in the trial transcript regarding the defendant's mental capacity, no such evidence was presented during the suppression hearing. Moreover, we are not convinced from the evidence presented at trial, or the defendant's demeanor during the video-taped confession, that his mental disabilities prevented him from understanding his rights.

■ The final contention made by the defendant regarding the admissibility of his confession is that it was involuntary, because the police failed to take him before a magistrate "without unnecessary delay," as required by Tenn.R.Crim.P. 5(a). The defendant argues he should have been taken before a magistrate during the three-hour time period between his release from the hospital and the confession. If he had been taken before a magistrate during that time, the defendant contends that he might not have confessed.

In making this argument, the defendant urges this Court to construe Tenn. R.Crim.P. 5(a) in a manner similar to Fed. R.Crim.P. 5(a). Rule 5(a) of the Federal Rules of Criminal Procedure is construed by 18 U.S.C.A. § 3501(c) (1985), which provides that a confession made while in the custody of law enforcement officers is not inadmissible solely because of delay in bringing that person before a magistrate, if the confession was given within six hours immediately following his arrest or other such detention. Applying this construction to Rule 5(a) of the Tennessee Rules of Criminal Procedure, the defendant contends that his confession is inadmissible because he was arrested at 7:00 a.m. and was not taken before a magistrate until after the taping of his confession concluded at 1:30 p.m., six and one-half hours after his arrest.

This argument, however, was addressed and rejected in *State v. Readus*, 764 S.W.2d 770 (Tenn.Crim.App.1988), *appeal denied, id.* (Tenn.1989). In *Readus*, after noting that Tennessee does not have a statute similar to 18 U.S.C.A. § 3501(c), the Court of Criminal Appeals held that:

> [t]he better reasoned cases interpreting "unreasonable delay" in this context say that it is one factor to be taken into

account in evaluating the voluntariness of a confession; and that if the totality of the circumstances indicates that a confession was voluntarily given, it shall not be excluded from evidence solely because of delay in carrying the confessor before a magistrate.

*Id.,* 764 S.W.2d at 774. *See also State v. Taylor,* 771 S.W.2d 387 (Tenn.1989).

Applying this standard, we find that the defendant's confession was not involuntary as a result of the delay in taking him before a magistrate. There is no evidence that coercive influences were exerted upon him during the time period between his release from the hospital and the taped confession, except for the inherently compelling atmosphere of being in police custody. As stated in *State v. Smith, supra,* 834 S.W.2d at 920, this single factor alone is not sufficient to vitiate the voluntariness of a confession. In addition, Middlebrooks was adequately apprised of his rights and there is no evidence that he failed to understand those rights.

Accordingly, under the totality of the circumstances, we hold that the defendant knowingly and voluntarily waived his constitutional rights and voluntarily confessed his involvement in the murder of Kerrick Majors. We therefore affirm the trial court's denial of the motion to suppress.

### B. Jury Discretion To Impose The Death Penalty

■ The next issue presented on this appeal is whether the trial court's instructions removed the jury's discretion in deciding whether to impose the death penalty in violation of the defendant's rights under Article I, §§ 8, 16, and 19 of the Tennessee Constitution. The defendant contends that the trial judge made the death penalty mandatory by instructing potential and actual jurors, through both the juror information sheets and the jury instructions, that if aggravating circumstances outweigh mitigating circumstances, the sentence shall be death. We find no merit to this argument.

In its instructions, the trial court tracked the language of Tenn.Code Ann. § 39-2-203(g) (1982), the governing sentencing statute at that time, which provided that:

[i]f the jury unanimously determines that at least one statutory aggravating circumstance or several aggravating circumstances have been proved by the state beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating circumstances, the sentence shall be death.

Therefore, the defendant's challenge to the court's instructions is really an attack upon the sentencing statute.

The defendant first argues that "the sentence shall be death" portion of the statute violates Article I, § 19 of the Tennessee Constitution, which requires that "in all indictments for libel, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other criminal cases." The defendant contends that the "shall" language of § 39-2-203(g) deprives the jury of its constitutional powers under Article I, § 19, to impose its own decision. We disagree.

This argument was recently addressed in *State v. Black,* 815 S.W.2d 166 (Tenn.1991), where we found that Tenn.Code Ann. § 39-2-203(g) does not violate Article I, § 19 of the Tennessee Constitution. Accordingly, we hold that the judge's instructions, which merely tracked the language of the statute, did not remove the jury's discretion in violation of Article I, § 19.

■ Along the same lines, the defendant argues that the judge's instructions violated Article I, § 8 of the Tennessee Constitution, which provides "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." Other than just citing the provision, however, counsel for the defendant does not tell us how the instructions or the statute violates Article I, § 8. We can only surmise that counsel for the defendant believes that the "shall" language of the statute removes the jury's discretion and deprives the defendant of a "judgment of his peers."

We find the rationale of *State v. Black, supra,* under Article I, § 19, to be equally applicable to Article I, § 8. Accordingly, we hold that Tenn.Code Ann. § 39–2–203(g) does not remove the jury's discretion and deprive the defendant of a "judgment of his peers" in violation of Article I, § 8.

The defendant further contends that the jury instructions created a presumption of death, whereby the jury had to automatically impose the death penalty as soon as it found him guilty of kidnapping, a statutory aggravating circumstance under Tenn.Code Ann. § 39–2–203(i)(7) (1982). As a result, the defendant argues that the presumption created by the instructions improperly shifted the burden of proof from the State to the defendant.

Once again, this argument was recently addressed and rejected in *State v. Boyd,* 797 S.W.2d 589 (Tenn.1990), where we found that the statute clearly outlines where the burden of proof lies and does not impose a presumption of death upon the finding of one aggravating circumstance. *Id.,* 797 S.W.2d at 596. As a result, we hold that the judge's instructions did not create a presumption of death and shift the burden of proof to the defendant.

## C. Jury Voir Dire and Challenges For Cause

The next issue we address is whether the trial court erred in failing to strike certain jurors for cause. The defendant contends that he had to exhaust his peremptory challenges on jurors that should have been excused for cause because their admitted beliefs in favor of the death penalty would have prevented them from following the law. Since he had to exhaust his peremptory challenges on those jurors, the defendant argues that he was deprived of the opportunity to empanel a fair and impartial jury in violation of the Sixth Amendment to the U.S. Constitution, and Article I, § 9 of the Tennessee Constitution.

Irrespective of whether the trial judge should have excluded the seven challenged jurors for cause, any error in this respect is harmless unless the jury who heard the case was not fair and impartial.

*State v. Thompson,* 768 S.W.2d 239, 246 (Tenn.1989). It is a long-settled principle that a defendant who disagrees with a trial court's ruling on for cause challenges must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise peremptory challenges to remove the jurors. Even then, however, the failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him. *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80, 91 (1988); and *State v. Jones,* 789 S.W.2d 545, 549 (Tenn.1990).

In this case, there is no claim, and the record does not show, that an incompetent juror was forced upon the defendant. Although counsel for the defendant argues that he had to exhaust all of his peremptory challenges on jurors that should have been excluded for cause, he does not tell us how Middlebrooks was prejudiced by not being able to peremptorily challenge any of the jurors who ultimately heard the case. The voir dire transcripts demonstrate that each juror hearing the case was competent, and there is no evidence that the defendant was deprived of a fair and impartial jury. Accordingly, we find no merit to the defendant's argument.

## D. Admissibility of Evidence

The defendant further argues that the trial court erred in permitting certain evidence to be introduced at trial, thereby effectively denying Middlebrooks his right to a fair trial in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution, and Article I, §§ 8 and 16 of the Tennessee Constitution. Specifically, the defendant challenges the admission of Shannon Stewart's testimony, the admission of Detective Moore's testimony, and the admission of photographs during the guilt and penalty phases of the trial.

The defendant contends that the trial court erred in allowing Shannon Stewart to testify that Middlebrooks told him on the morning of the murder that he was a mem-

ber of the Ku Klux Klan, that he disliked "niggers," and that he once busted a black man in the mouth for saying "hi" to him. The defendant argues that this testimony is inadmissible hearsay, that it is irrelevant, and that its probative value is substantially outweighed by its prejudicial effect. We find no merit to this argument.

We conclude that the elicited testimony regarding the defendant's statement that he dislikes blacks fits within the state of mind exception of Tenn.R.Evid. 803(3), which provides in part, that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is admissible hearsay. Although the Tennessee Rules of Evidence were not in effect at the time of trial, the rule merely restates the common law state of mind exception which has long been recognized by Tennessee courts. Tenn.R.Evid. 803(3), Advisory Commission Comments. Accordingly, the trial court correctly admitted Stewart's testimony about the defendant's statement evidencing his dislike for blacks under the state of mind exception to the hearsay rule.

In addition, we find that all three of the defendant's statements were admissions, and are therefore admissible. Under the Tennessee common law rules of evidence, the statements would be admissible as an exception to the hearsay rule. *State v. Jones*, 598 S.W.2d 209, 223 (Tenn.1980). On the other hand, under the Federal Rules of Evidence, the statements would be admissible non-hearsay. Fed.R.Evid. 801(d)(2). Regardless, however, "whether a criminal defendant's own statement[s] be treated as an exception to the hearsay evidence rule, or as an admission not governed by the rule, the result is the same. The admission is competent proof." *State v. Jones, supra*, 598 S.W.2d at 223.

With respect to the other objections, the trial court ruled that the defendant's statements were relevant to the issue of premeditation, and that the probative value of the statements outweighed their prejudicial effect. We agree.

The testimony is clearly relevant to show premeditation and a motive for the victim's brutal slaying. The testimony is also relevant to contradict the defendant's statement that Roger Brewington was the leader in the commission of the offense. In addition, given the relevancy of the statements, we find that the prejudicial effect did not substantially outweigh their probative value. *State v. Banks*, 564 S.W.2d 947, 951 (Tenn.1978). Accordingly, we hold that the trial court correctly admitted Shannon Stewart's testimony about these statements.

The defendant next contends that the trial court erred in admitting the testimony of Detective Moore with respect to the issue of whether the bloody T-shirt around the victim's neck had been used as a gag. Although he had not been offered as an expert, Detective Moore testified that the bloody T-shirt had been used as a gag. After defense counsel objected and a bench conference was held, the trial judge allowed Detective Moore to testify as to whether the bloodstains on the T-shirt "appeared to correspond consistent with its use as a gag." The defendant contends that this testimony is inadmissible lay opinion, which improperly encroaches upon the jury's fact-finding function.

A non-expert witness must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions. *Blackburn v. Murphy*, 737 S.W.2d 529, 531 (Tenn.1987). The purpose of this rule is "to preserve the primary fact-finding role of the jury, since '[i]t is the function of the witness to state evidentiary facts and the function of the jury to draw such conclusions as the facts warrant.'" *Id.* (quoting *Wilson v. Nashville, Chattanooga & St. Louis Ry.*, 16 Tenn.App. 695, 705, 65 S.W.2d 637, 643 (1933)).

Nevertheless, there are exceptions to the general rule. "Non-expert opinion testimony can be admissible when 'such testimony describes observed facts in the only way in which they can be clearly described.'" *Id.*, 737 S.W.2d at 532 (quoting *National Life & Accident Ins. Co. v. Follett*, 168 Tenn.

647, 662, 80 S.W.2d 92, 98 (1935)). Therefore, admissible lay opinion testimony is limited to those circumstances

> [w]here facts perceived by the senses are numerous, and it is difficult to describe them adequately to the jury, and the conclusion or inference to be drawn from such facts is simple and within the range of common experience, and the witness can relate what he has seen more accurately and more easily by stating his conclusion than by attempting to detail the [evidentiary] facts.

*Id.* (quoting *Reed v. Allen*, 522 S.W.2d 339, 343 (Tenn.App.1974)).

In this case, there is a close question as to whether Detective Moore's testimony crossed the line between permissible and impermissible lay opinion. However, even assuming it was inadmissible lay opinion, we find that any error in admitting his testimony was harmless. "An error is harmless or prejudicial depending on the extent to which the proof in the record exceeds the standard necessary to sustain a jury decision.... Thus, the more convincing the evidence, the less prejudicial the error." *State v. Bobo*, 727 S.W.2d 945, 955–56 (Tenn.1987). Since the defendant admitted in his taped confession that the victim was gagged, any error in admitting Detective Moore's testimony about the bloody T-shirt being used as a gag was harmless.

The defendant further argues that the trial court erred in admitting prejudicial photographs during the trial. The defendant contends that it was error for the trial court to admit, during the guilt phase, a photograph of the knife he had in his possession when he was arrested. In addition, the defendant argues that it was error for the trial court to admit photographs of the victim during the penalty phase of the trial.

Before admitting photographs, a trial judge must determine whether they are relevant, and whether their probative value is substantially outweighed by their prejudicial effect. *State v. Banks*, 564 S.W.2d 947, 949–51 (Tenn.1978). These determinations lie within the discretion of the trial court, and the trial court's rulings will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. *Id.*, 564 S.W.2d at 949.

■ After examining the photographs, we find that the trial judge did not abuse her discretion by admitting them into evidence. The photograph of the knife was relevant to rebut the defendant's claim that he was unjustly attacked by the police dogs. Moreover, we fail to see how the defendant was prejudiced by admission of the photograph since it depicted a common butcher knife, rather than a specially designed knife such as the murder weapon, lying in the floor of the defendant's makeshift home.

■ The photographs of the victim's body were properly admitted during the penalty phase because they were relevant to prove one of the aggravating circumstances, i.e. that "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn.Code Ann. § 39-2-203(i)(5) (1982). Moreover, although Detective Moore testified as to the wounds and condition of the body, the photographs supplement his testimony and show the brutality employed by the killer in inflicting numerous wounds on the victim. *State v. Miller*, 771 S.W.2d 401, 404 (Tenn.1989); *State v. Harbison*, 704 S.W.2d 314, 318 (Tenn.1986). Accordingly, despite the fact that the photographs are graphic, we hold that their probative value is not substantially outweighed by their prejudicial effect.

### E. *Felony Murder—Nexus Between Felony and Murder*

The next issue for our determination is whether the trial court correctly overruled the defendant's motion for a judgment of acquittal. The defendant contends that the court should have granted the motion with respect to the felony murder count of the indictment on the basis that there was an "insufficient nexus" between the kidnapping and the murder, such that the kidnapping could not have been the proximate cause of the murder. This argument is clearly without merit.

■ The statute provides that "[e]very murder ... committed in the perpetration of, or attempt to perpetrate, any ... kidnapping ... is murder in the first degree." Tenn.Code Ann. § 39–2–202(a) (1982 & Supp.1988). Nowhere in the statute is there a requirement that the murder occur as a proximate cause of the kidnapping. The statute only requires that the murder be "committed in the perpetration of" a kidnapping, which is defined as the unlawful seizure, confinement, or abduction of another with the felonious intent to cause the other to be confined or detained secretly against his will. Tenn.Code Ann. § 39–2–301(a) (1982 & Supp.1988).

■ The record clearly demonstrates that Kerrick Majors was seized in a headlock and taken to a wooded area against his will. The record also shows that during the period he was being held against his will, Kerrick was beaten and stabbed to death. As a result, it is clear that the murder of Kerrick Majors was "committed in the perpetration of" a kidnapping.

### F. Psychiatric Records of Witness For Cross-Examination

The defendant argues that the trial court erred in refusing to allow defense counsel access to the confidential psychiatric records of Shannon Stewart for cross-examination. Toward the end of the State's examination of Stewart, defense counsel informed the court that he had just learned that morning that Stewart was presently undergoing psychiatric care at Cumberland Hall Psychiatric Hospital in Nashville. As a result, defense counsel moved to review Stewart's records from this hospitalization before beginning cross-examination to ascertain if his mental condition interfered with his memory of past events.

After reviewing Stewart's prior statements and his testimony at Roger Brewington's trial, the trial court found that they were consistent with and contained no substantial variation from his testimony at this trial to warrant turning the records over to the defense, and denied defense counsel's motion. For the purposes of appellate review, however, the trial court ordered a transcript of Stewart's testimony at the Brewington trial and a sealed copy of his psychiatric records to be made exhibits to the trial record.

The defendant contends that the trial court's failure to allow counsel to examine Stewart's records deprived him of the opportunity to confront witnesses against him, in violation of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution, and Article I, § 9 of the Tennessee Constitution. In addition, the defendant contends that he was entitled to review the records under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Tenn.R.Crim.P. 16(a)(1)(D).

The Sixth Amendment to the U.S. Constitution, which is applicable to the States through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The corresponding provision of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right ... to meet the witnesses face to face." Tenn. Const. art. I, § 9. Although the language is not identical, this Court has previously adopted the standards of the U.S. Supreme Court under the Sixth Amendment in determining whether there has been a violation of the confrontation clause of Article I, § 9. *State v. Armes*, 607 S.W.2d 234, 237 (Tenn.1980).

■ The confrontation clause of the Sixth Amendment provides two types of protection for criminal defendants: the right to physically face those who testify against him, and the right to cross-examine witnesses. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40, 53 (1987). The right to cross-examine witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. *Id.*, 480 U.S. at 53, 107 S.Ct. at 999, 94 L.Ed.2d at 54. Therefore, the right to confront witnesses is satisfied if defense counsel receives wide latitude at trial to cross-

examine, because the confrontation clause only guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985)).

 In this case, we find that the defendant was not denied the opportunity to effectively cross-examine Shannon Stewart. The trial court denied defense counsel's motion without conducting an *in camera* inspection of the records to determine what, if any, probative information they contained. This was error because the psychiatric records pertained to the mental instability of a witness that existed within a reasonable time before the testimony was given, which is relevant in determining veracity. *State v. Barnes*, 703 S.W.2d 611, 617–18 (Tenn.1985). However, the error was harmless because if the trial court had reviewed the records, as we have done, it would have found that they contained very little information probative of Stewart's credibility.

The records indicate that Stewart was hospitalized at the time of trial for what were essentially behavioral problems. As a result, the information contained in the records had little relevance to Stewart's credibility or the probative value of his testimony. In addition, there is nothing in the trial record to demonstrate that defense counsel was prevented from asking Stewart about his hospitalization. We therefore conclude that the defendant was not denied the opportunity "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347, 355 (1974).

 The defendant next argues that his counsel was entitled to review the psychiatric records under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, the Supreme Court held that it is a violation of the due process clause of the Fourteenth Amendment for the prosecution to suppress evidence favor

able to an accused after a request for disclosure "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. Since there has been no showing that records contained any material evidence favorable to the defendant, we find no merit to this argument.

 The final argument raised by the defendant regarding the psychiatric records is that he was entitled to review them under Tenn.R.Crim.P. 16(a)(1)(D), which provides that:

> [u]pon request of a defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

We find no merit to this argument because there is no evidence that Cumberland Hall is connected in any way with the State so that the records could be considered "within the possession, custody or control of the state" for discovery purposes under Rule 16(a)(1)(D). *State v. Fox*, 733 S.W.2d 116, 118 (Tenn.Crim.App.1987). In addition, there has been no showing that the information contained in the records was "material to the preparation of the defense."

Accordingly, we affirm the trial court's decision to deny counsel for the defendant access to Shannon Stewart's confidential psychiatric records.

### G. *Jury Argument—Death Penalty Deterrence*

The next issue raised by the defendant is whether the trial court erred in overruling the defendant's motion, prior to the sentencing phase, to prohibit the State from arguing to the jury the deterrent effect of the death penalty. In overruling the mo

tion, the trial judge indicated that she would allow argument on specific deterrence, i.e., deterrence of the defendant, as opposed to general deterrence, since the defendant had put on proof that, if properly medicated, he would function well under a life sentence. The defendant contends that since defense counsel cannot argue that the death penalty has no deterrent effect under this Court's holding in *State v. Johnson*, 632 S.W.2d 542, 547–48 (Tenn. 1982), then the State should not be allowed to argue that the death penalty does have a deterrent effect.

This argument is completely without merit. We are unable to find, and counsel for the defendant has not pointed out, anywhere in the State's argument to the jury a reference to either the specific or general deterrent effect of the death penalty.

### H. Missing Witness Rule

■ The defendant next argues on appeal that the trial court erred in refusing to give the jury instructions on the missing witness rule due to the absence of testimony from Middlebrook's co-defendants; and whether the trial court erred in preventing defense counsel from commenting upon the absence of the co-defendants. Under the missing witness rule, a party is entitled to argue, and have the jury instructed, that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions. *State v. Francis*, 669 S.W.2d 85, 88 (Tenn.1984); *State v. Jones*, 598 S.W.2d 209, 224 (Tenn.1980). Before the missing witness rule can be invoked, however, the evidence must show that "the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for trial." *Delk v. State*, 590 S.W.2d 435, 440 (Tenn.1979).

■ The defendant contends that during the guilt phase of the trial, defense counsel should have been able to comment

upon, and have the jury instructed upon, the absence of testimony from Roger Brewington and Tammy Middlebrooks under the missing witness rule. The defendant argues that the trial court's refusal to instruct the jury and allow comment upon the missing witnesses left him with the only option of calling the co-defendants to testify, thereby impermissibly shifting the burden of proof in violation of the due process clause of the Fourteenth Amendment to the U.S. Constitution, and Article I, §§ 8 and 17 of the Tennessee Constitution.

We find no merit to this argument because defense counsel expressly disavowed any intent to rely on the missing witness rule during the guilt phase. After closing argument, while arguing his motion for a mistrial, defense counsel stated that "I did not seek the missing witness charge because I did not think it was appropriate." Since defense counsel did not raise this issue during the trial or in the motion for new trial, the issue is waived and cannot be raised for the first time on appeal to this Court. Tenn.R.App.P. 3(e).

■ Next, the defendant contends that the trial court erred in granting the State's motion to prevent defense counsel from arguing the missing witness rule to the jury during the sentencing phase. The defendant argues that the trial court's ruling was incorrect, and prevented him from taking advantage of the adverse inference to prove one of the statutory mitigating circumstances, i.e., that "[t]he defendant was an accomplice in the murder committed by another person and the defendant's participation was relatively minor." Tenn.Code Ann. § 39–2–203(j)(5) (1982). As a result, the defendant contends that the trial court's incorrect ruling denied him of his constitutional right to a fair trial and resulted in the arbitrary and capricious imposition of the death penalty.

We find no merit to this argument because the trial court correctly ruled that the defendant could not argue the missing witness rule to the jury during the sentencing phase. After reviewing the requirements for invoking the missing witness rule, the trial court ruled that the defen-

dant had not met the requirements of expected favorable testimony and exclusive availability. We agree.

There is nothing in the record to indicate that a relationship existed between the State and either Roger Brewington or Tammy Middlebrooks such that would naturally incline them to testify favorably for the State. The co-defendants had already been convicted, and there was no pending plea bargain agreement between them and the State at the time of the defendant's trial. In addition, there is no evidence that it was peculiarly within the power of the State to produce the co-defendants to testify. Accordingly, we affirm the trial court's ruling on this issue.

### I. Requests For Jury Instructions

■ The next issue for us to consider is whether the trial court erred in refusing to instruct the jury pursuant to the defendant's request for special instructions. The defendant contends that the trial court's refusal to instruct the jury in accordance with twelve special requests deprived him of his constitutional right to a fair trial.

After reviewing the proposed instructions and the actual jury charge, we find no error in the trial court's refusal to give the proposed instructions. Some of the proposed instructions incorrectly state the law, while the other proposed instructions were adequately covered in the judge's actual charge to the jury. Accordingly, since "[i]t is not error to refuse a special request where the charge as given fully and fairly states the applicable law," *Edwards v. State*, 540 S.W.2d 641, 649 (Tenn.1976), we affirm the trial court on this issue.

### PART II.

### CONSTITUTIONALITY OF THE DEATH PENALTY FOR FELONY MURDER

■ The final issue raised on this appeal is whether the trial court erred in overruling the defendant's motion to dismiss the indictment on the basis that the death penalty is unconstitutional. The defendant challenges the death penalty itself as cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution. We find no merit to this argument. It has been considered and rejected many times by this Court. *State v. Black*, 815 S.W.2d 166, 185 (Tenn.1991); and *State v. McCormick*, 778 S.W.2d 48, 53 (Tenn.1989).

Although the defendant has not directly raised the issue, we wish to address the issue of the constitutionality of Tennessee's death penalty statute as punishment for felony murder. A majority of the present Court has held that the death penalty *per se* does not violate Article I, § 16 of the Tennessee Constitution, *see State v. Black*, *supra*, 815 S.W.2d at 189–91, but we have not yet considered the issue of the constitutionality of the death penalty as punishment for felony murder.

The imposition of the death penalty for the crime of murder has a long history of acceptance both in the United States and in England. The common-law rule imposed a mandatory death sentence on all convicted murderers. *McGautha v. California*, 402 U.S. 183, 197–198, 91 S.Ct. 1454, 1462–1463, 28 L.Ed.2d 711 (1971). And the penalty continued to be used into the 20th century by most American States, although the breadth of the common-law rule was diminished, initially by narrowing the class of murderers to be punished by death and subsequently by widespread adoption of laws expressly granting juries the discretion to recommend mercy. *Id.*, at 199–200, 91 S.Ct., at 1463–1464. *See Woodson v. North Carolina*, 428 U.S. 280, 289–292, 96 S.Ct. 2978, 2984–2985, 49 L.Ed.2d 944.

*Gregg v. Georgia*, 428 U.S. 153, 176–77, 96 S.Ct. 2909, 2927, 49 L.Ed.2d 859, 876–77 (1976).

In Tennessee, under the pre–1989 law, first-degree murder was defined as follows:

> [e]very murder perpetrated by means of poison, lying in wait, or by other kinds of willful, deliberate, malicious, and premeditated killing, *or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree,*

*arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb....*

Tenn.Code Ann. § 39–2–202(a) (1982 & Supp.1988) (emphasis added).

With the exception of the inclusion of different underlying felonies over the years, the so-called felony murder statute remains essentially the same as that enacted in § 3 of Chapter 23 of the Public Acts of 1829.[2] The 1829 Act was modeled on the Pennsylvania Act of 1794, 1794 Pa. Laws, ch. 1766, § 2, which divided the common-law offense of murder into two degrees in order to achieve proportionality in punishment and to restrict the imposition of the death penalty. *See* Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder,* 97 U.Pa.L.Rev. 759 (1949); *see also Bratton v. State,* 29 Tenn. 103, 110 (1849) (recognizing the Pennsylvania statute is almost identical to Tennessee's).

■ Under Tennessee's statutory definition of felony murder, prior to the 1989 Code Revision, the prosecution is not required to prove the elements of malice, deliberation and premeditation, or that the defendant intended to kill the victim. *State v. Johnson,* 661 S.W.2d 854, 861 (Tenn.1983); *Farmer v. State,* 201 Tenn. 107, 115, 296 S.W.2d 879, 883 (1956); *State v. Hopper,* 695 S.W.2d 530, 535 (Tenn.Crim. App.1985); *Tosh v. State,* 527 S.W.2d 146, 147–48 (Tenn.Crim.App.1975). Instead, where the offense is committed in the perpetration of a designated felony, the elements of malice, deliberation and premeditation are implied. *See State v. Barber,* 753 S.W.2d 659, 671 (Tenn.1988); *State*

*v. Norris,* 684 S.W.2d 650, 653 (Tenn.Crim. App.1984).[3]

■ The Tennessee offense extends both to the killer and his accomplices. A defendant who is a willing and active participant in a robbery becomes accountable for all of the consequences flowing from the robbery and may be convicted of first-degree murder where a co-perpetrator of the felony is the actual killer. *Dupes v. State,* 209 Tenn. 506, 512, 354 S.W.2d 453, 456 (1962); *Woodruff v. State,* 164 Tenn. 530, 537, 51 S.W.2d 843, 845 (1932); *Moody v. State,* 46 Tenn. 299, 305–307 (1869); *State v. Brown,* 756 S.W.2d 700, 703 (Tenn. Crim.App.1988); *State v. Hopper, supra,* 695 S.W.2d at 535.

■ The result of the felony murder doctrine in Tennessee is thus to impose a rule of strict liability allowing the underlying felonious intent to supply the required mens rea for the homicidal actus reus and to impose vicarious liability for the acts of another. *See, generally,* Comment, *The Constitutionality of Imposing the Death Penalty for Felony Murder,* 15 Hous. L.Rev. 356, 366–369 (1978). Therefore, Tennessee's statute allows convictions for first-degree felony murder of those who commit accidental killings, and of persons who did not kill the victim and may not have intended that the victim be killed or suffer any physical harm.

Courts have often stated that the purpose of the felony murder rule is to deter felons from accidentally or negligently killing in the course of felonies by holding them strictly liable for the results of their dangerous conduct. *See, e.g., People v. Washington,* 62 Cal.2d 777, 781, 44 Cal. Rptr. 442, 445, 402 P.2d 130, 133 (1965); *State v. Lashley,* 233 Kan. 620, 631, 664

---

2. *Norris* held that the felony murder statute's failure to require intent to kill or express malice was not unconstitutional in a noncapital case. Agreeing, this Court has held that the felony murder statute does not violate the due process clause of the Fifth Amendment to the United States Constitution by elevating accidental killings, or those in self-defense, or a lesser degree of homicide to first-degree murder, if committed during one of the listed felonies. *State v. Barber,* 753 S.W.2d 659, 671 (Tenn.1988).

3. *Norris* held that the felony murder statute's failure to require intent to kill or express malice was not unconstitutional in a noncapital case. Agreeing, this Court has held that the felony murder statute does not violate the due process clause of the Fifth Amendment to the United States Constitution by elevating accidental killings, or those in self-defense, or a lesser degree of homicide to first-degree murder, if committed during one of the listed felonies. *State v. Barber,* 753 S.W.2d 659, 671 (Tenn.1988).

P.2d 1358, 1369 (1983); *Payne v. State,* 81 Nev. 503, 506, 406 P.2d 922, 924 (1965). Consistent with that purpose, many courts have limited the scope of the rule to felonies that are dangerous to human life.[4]

The felony murder doctrine has been frequently and negatively criticized by courts and legal commentators, the criticism by commentators becoming even more intense when felony murder is used to make a defendant death eligible. *See, e.g., People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304 (1980); Finkel, *Capital Felony–Murder, Objective Indicia, and Community Sentiment,* 32 Ariz.L.Rev. 819 (1990); Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death,* 31 B.C.L.Rev. 1103 (1990); Roth & Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads,* 70 Cornell L.Rev. 446 (1985); Comment, *The Constitutionality of Imposing the Death Penalty for Felony Murder,* 15 Hous.L.Rev. 356 (1978).

As more refined standards of culpability have developed, some courts and commentators have said that the intent to commit a felony is not equivalent to the other mental states associated with murder. *See* W. LaFave and A. Scott, *Handbook on Criminal Law,* § 71, at 554 (1972). As a result of this and other criticisms, some jurisdictions have abolished the felony murder rule by statute or by judicial action.[5]

Nonetheless, the vast majority of states that have the death penalty permit it to be imposed in cases of felony murder under some circumstances. Few legislatures

have repealed the doctrine, and the courts have generally continued to enforce it. There are thirty-six states which allow the imposition of the death penalty, and thirty-two of these states allow the death penalty for felony murder. Finkel, *Capital Felony–Murder, Objective Indicia, and Community Sentiment,* 32 Ariz.L.Rev. at 890. Most states impose the death penalty only where killings perpetrated during felonies are intentional, deliberate, purposeful or knowing. The number of states allowing capital punishment for pure felony murder, or felony murder simpliciter, is a distinct minority. Tennessee moved out of that status in 1989 by amending its first-degree murder statute to provide that first-degree murder occurs only where a killing in the perpetration of one of the listed felonies is reckless. *See* Tenn.Code Ann. § 39–13–202(a)(2) (1991).[6]

The minimum standards for determining whether a sentence of death may be constitutionally imposed under the United States Constitution for felony murder are indicated by the United States Supreme Court in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), which dealt with the problem of imposing the death penalty in cases of vicarious liability for felony murder, i.e., where an accomplice in the felony, one who did not actually kill the victim, is convicted of murder under the felony murder doctrine and receives the death penalty.

---

**4.** The rationale for limiting the rule to dangerous felonies is that in order for the potential felon to be deterred, he must foresee the possibility of death or injury resulting from the commission of the felony.

**5.** The rule was abolished in England in 1957. *See* Homicide Act 1957, 5 & 6 Elizabeth II, ch. 11, § 1. Alaska, Hawaii, and Kentucky have abolished the felony murder rule by statute, requiring that the killing be intentional or knowing. In Michigan, the judiciary abrogated the rule in *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304 (1980). Legislatures in other jurisdictions have responded to the criticisms by requiring proof of a higher degree of culpability. For example, Arkansas and New Hampshire require proof of recklessness in addition to

commission of a felony. *See* Ark.Stat.Ann. § 41–1502 (1977) and N.H.Rev.Stat.Ann. § 630:1, subd. I(a), (b) (1974).

**6.** "Reckless" is defined as the actions of one who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as reviewed from the accused person's standpoint. Tenn.Code Ann. § 39–11–106(a)(31).

■ Under the rules of those cases, the death penalty is only permissible under the Eighth and Fourteenth Amendments for one who himself kills, attempts to kill, or intends that a killing take place or that lethal force will be imposed, *Enmund*, 458 U.S. at 797, 102 S.Ct. at 3376, 73 L.Ed.2d at 1151, or for one whose personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life— although there is no intent to kill, *Tison*, 481 U.S. at 157–58, 107 S.Ct. at 1687–88, 95 L.Ed.2d at 144.

■ These federal standards do not, however, answer the question under the state constitution. As Justice Brock observed in his dissent in *State v. Dicks*, 615 S.W.2d 126, 132 (Tenn.1981), we may not impinge upon the minimum level of protection established by Supreme Court interpretations of the federal constitutional guarantee, but may impose higher standards and stronger protections than those set by the federal constitution.

The present Court first examined the constitutionality of the imposition of capital punishment under Article I, § 16 of the state constitution in *State v. Black*, 815 S.W.2d 166 (Tenn.1991). There, we elected to follow the analysis of *Gregg v. Georgia*, *supra*, under which three inquiries are required:

> First, does the punishment for the crime conform with the contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate, penological objective?

*State v. Ramseur*, 106 N.J. 123, 169, 524 A.2d 188, 210 (1987) (citing *Gregg v. Georgia*, 428 U.S. at 173, 96 S.Ct. at 2925, 49 L.Ed.2d at 874–75).

In *Black*, a majority of the present Court reaffirmed the prior holdings of this Court that the death penalty does not *per se* violate Article I, § 16, of the Tennessee Constitution. 815 S.W.2d at 190–91. As a part of our analysis, we said that the legislative and constitutional history of Tennessee indicates a clear intent that the death penalty is, in some cases, an appropriate form of punishment, and that by reason of the language of the Constitution, the framers recognized the acceptability of capital punishment. *Id.*, 815 S.W.2d at 188. In addition, we noted that nothing in the constitutional legislative history mandates that death is invalid *per se* as cruel and unusual punishment under Article I, § 16. *Id.*

In determining whether the death penalty conforms with contemporary standards of decency for the crime of felony murder, we recognize that an assessment of contemporary values is relevant and that the standards of decency are not static, but are evolving as society matures. *See Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958). As *Gregg v. Georgia* teaches, this assessment of contemporary values is not subjective, but an examination of objective indicia that reflect the public attitude towards a given sanction. 428 U.S. at 173, 96 S.Ct. at 2925, 49 L.Ed.2d at 874.

It is evident that a large proportion of Tennessee society continues to find the death penalty for felony murder an appropriate and necessary criminal sanction. This approval is clearly evidenced by the actions of the General Assembly in re-enacting the 1977 felony murder statute after the 1972 decision of the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and our own state court decisions declaring the prior statute allowing the death penalty unconstitutional. *See Collins v. State*, 550 S.W.2d 643 (Tenn.1977), *cert. denied sub nom. Morgan v. Tennessee*, 434 U.S. 905, 98 S.Ct. 303, 54 L.Ed.2d 192 (1977); *State v. Hailey*, 505 S.W.2d 712 (Tenn.1974). The General Assembly's response to these court actions was to enact new statutes addressing the concerns expressed by the *Furman* court, but which continued to provide for the death penalty for felony murder. Legislatures of at least thirty-four other states took similar actions. *See Gregg v. Georgia*, 428 U.S. at 179–80, 96 S.Ct. at 2928, 49 L.Ed.2d at 878. As recently as 1989, the General Assembly reaffirmed that position. *See* Revised

Criminal Code of 1989, 1989 Tenn.Pub. Acts, ch. 591, § 1.

Examination of other state systems reveals that capital punishment for felony murder in some circumstances is acceptable in at least thirty-two of the thirty-six states with the death penalty. Finkel, *Capital Felony-Murder, Objective Indicia, and Community Sentiment,* 32 Ariz.L.Rev. at 890. In four states—Florida, Georgia, South Carolina, and Wyoming—there is presently no requirement of culpability. *See* Fla.Stat.Ann. § 782.04, and § 921.-141(5)(d) (West Supp.1992); Ga.Code Ann. § 26–1101 and § 27–2534.1 (Michie 1988); S.C.Code Ann. § 16–3–20(C)(a)(1) (Law.Co-op.Supp.1991); and Wyo.Stat. § 6–2–101(a) and § 6–2–102(h)(iv) (Supp.1991). Tennessee, as noted above, was previously a member of this minority position.

In addition to the legislative response, as *Gregg v. Georgia* points out, the jury is a significant and reliable objective index of contemporary values because it is so directly involved and because it maintains a link between contemporary community values and the penal system. 428 U.S. at 181, 96 S.Ct. at 2929, 49 L.Ed.2d at 879. Since the reimposition of the death penalty for felony murder in 1977, juries have consistently imposed the death penalty for that offense. *See, e.g., State v. Boyd,* 797 S.W.2d 589 (Tenn.1990); *State v. Irick,* 762 S.W.2d 121 (Tenn.1988); *State v. Bell,* 745 S.W.2d 858 (Tenn.1988); *State v. Sparks,* 727 S.W.2d 480 (Tenn.1987); *State v. Goad,* 707 S.W.2d 846 (Tenn.1986); *State v. Hartman,* 703 S.W.2d 106 (Tenn.1985); *State v. Matson,* 666 S.W.2d 41 (Tenn.1984); *State v. Simon,* 635 S.W.2d 498 (Tenn.1982); *State v. Coleman,* 619 S.W.2d 112 (Tenn.1981).

The second question that must be answered under the *Black* test, adopted from *Gregg,* is whether the punishment of death is disproportionate in relation to the crime for which it is imposed. We are concerned here only with the imposition of capital punishment for the crime of felony murder in the abstract.

As stated earlier, under the statute prior to the 1989 revision, a person was guilty of first-degree murder under the felony mur-

der doctrine without regard to intent to kill so long as the killing occurred during the perpetration of a felony. Yet, this absence of intent does not render the death penalty disproportionate. As Justice O'Connor observed, writing for the majority in *Tison v. Arizona,* 481 U.S. at 157, 107 S.Ct. at 1688, 95 L.Ed.2d at 144:

> [S]ome nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another, not caring whether the victim lives or dies, *or the robber who shoots someone in the course of the robbery utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.* This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an intent to kill.

(Emphasis added.) See *also Schad v. Arizona,* 501 U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

In the early case of *State v. Pritchett,* 621 S.W.2d 127 (Tenn.1981), the defendant argued that felony murder resulted

> in imposition of the death penalty in the absence of premeditation and in cases involving the least, rather than the most 'blameworthy' of murderers, because, it is insisted, the statute contains no guidelines for ascertaining culpability or the degree of culpability that will prevent disproportionate application of the death penalty.

*Id.,* 621 S.W.2d at 140. This Court replied,

> [t]he short answer to the issue posed by defendant is that, conceding such a result may be possible in the trial court, it is the statutory and inherent obligation of this Court to correct the error on appeal. An integral part of the death penalty statute that must be construed in pari materia is the automatic review of every death sentence by this Court. T.C.A. § 39–2406. Subsection (c) of that statute enumerates our duties that include eliminating any arbitrary, exces-

sive, or disproportionate imposition of the death penalty. . . .

*Id.*

Accordingly, rather than an absolute rule of *per se* disproportionality, this Court has in the past relied on its statutory duty of review under Tenn.Code Ann. § 39–2–205 [now § 39–13–206] to assure that the sentence *in each case* is not disproportionate or excessive. We agree with that approach and with Justice Blackmun's rejection of the *per se* proportionality approach in his dissent in *Lockett v. Ohio,* 438 U.S. 586, 613–19, 98 S.Ct. 2954, 2969–71, 57 L.Ed.2d 973, 995–98. He observed in that connection that a sentence in felony murder should be based on evidence of a particular defendant's participation in homicide and his mens rea in regard to the homicidal act.

We, therefore, reaffirm the rejection of a *per se* proportionality approach in favor of the required statutory proportionality review.

The third question for the Court under the *Black* test is whether the infliction of the death penalty for felony murder goes beyond that necessary to accomplish any legitimate penological objective. On the one hand it has been argued that, because felony murder encompasses unintentional and accidental murders, the legitimate penological objective of deterrence is not satisfied. In response, we observe that the legislature may decide that the death penalty is even more effective in deterring felony murders than simple atrocious murders since an experienced felon is more likely to assess the consequences of his acts than other murderers who are more likely to act on passion or impulse, unmindful of the consequences of their actions. *Gray v. Lucas,* 677 F.2d 1086, 1104 (5th Cir.1982) (replying to an equal protection/due process challenge to capital felony murder). *See* Crump & Crump, *In Defense of the Felony Murder Doctrine,* 8 Harv.J.L. & Pub.Pol'y 359 (1985).

"The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg v. Georgia, supra,* 428

U.S. at 183, 96 S.Ct. at 2929–30, 49 L.Ed.2d at 880. As we commented in *Black:*

[w]hile increasingly questioned, retribution remains a valid penological justification for the death penalty.

[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

*Gregg v. Georgia,* 428 U.S. at 183, 96 S.Ct. at 2930. Channeling man's natural instinct for retribution "serves an important purpose in promoting the stability of a society governed by law" for "the seeds of anarchy are sown" when "people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve.'" *Furman v. Georgia,* 408 U.S. at 308, 92 S.Ct. at 2761 (Stewart, J., concurring).

*State v. Black,* 815 S.W.2d at 190.

Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.

*Gregg v. Georgia,* 428 U.S. at 184, 96 S.Ct. at 2930, 49 L.Ed.2d at 880–81.

We conclude that the death penalty for felony murder in Tennessee does not *per se* violate Article I, § 16 of the Tennessee Constitution. As we observed in *Black,* the issue of whether or not the death penalty constitutes cruel and unusual punishment is, in the last analysis, a moral question which has been resolved in this State by our legislature as the representative of the people. It is not the role of this Court to "superimpose personal morality" in difficult issues, *State v. Campbell,* 103 Wash.2d 1, 34, 691 P.2d 929, 948 (1984), nor to act as "a good reflex of a democratic society." *Dennis v. United States,* 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137, 1161 (1951) (Frankfurter, J., concur-

ring). For these reasons, we reaffirm the prior holdings of this Court that the death penalty in felony murder does not *per se* violate Article I, § 16 of the Tennessee Constitution.

## PART III.

### SENTENCING PHASE—CONSTITUTIONAL APPLICATION OF AGGRAVATING CIRCUMSTANCES

A corollary to the general argument that imposing the death penalty for felony murder is not constitutional is that Tennessee's death penalty statute does not sufficiently narrow the population of death-eligible defendants under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution. The argument is that it fails to narrow by allowing the use of Tenn.Code Ann. § 39–2–203(i)(7) as an aggravating circumstance in sentencing.

As applied in this case, prior to the revision of the Criminal Code of 1989, the aggravating circumstance of committing a murder during a felony essentially duplicated the elements of the offense of first-degree felony murder. Tenn.Code Ann. § 39–2–202(a)(1) (Supp.1988) provided, in part, that "[e]very murder ... committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree." The aggravating circumstance set forth in Tenn.Code Ann. § 39–2–203(i)(7) (1982), allowed a sentence of death upon a conviction of first-degree murder where

> [t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

This duplication of the elements of the offense by one of the aggravating factors has been challenged by capital defendants in the past. Some of the earlier attacks were based on double jeopardy and the argument that conviction under the felony murder aspect of § 39–2–202 required an automatic or mandatory death penalty because the jury had already found beyond a reasonable doubt the existence of an aggravating circumstance at the guilt phase of the trial. These arguments were rejected by the Court. *State v. Barnes,* 703 S.W.2d 611, 618 (Tenn.1985); *State v. Laney,* 654 S.W.2d 383, 387 (Tenn.1983); *State v. Pritchett,* 621 S.W.2d 127, 139–40 (Tenn. 1981); *Houston v. State,* 593 S.W.2d 267, 276 (Tenn.1980). Our legislature, however, has seen fit to prohibit such duplication by statute in non-capital sentencing, *see* Tenn. Code Ann. § 40–35–111 (1982) and § 40–35– 114 (1990), and we are of the opinion that Article I, § 16 of the Tennessee Constitution prohibits such duplication in capital sentencing, as well.

Our sister state of North Carolina has accepted the double-counting challenge to its death penalty statute, which contained similar duplicative aggravating circumstances. In *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1979), the North Carolina Supreme Court pointed out that their felony murder aggravating circumstance would always be supported by the evidence in a felony murder conviction, since the felony murder, by definition, must have occurred during the commission or attempted commission of one of the enumerated felonies. *Id.,* 298 N.C. at 112, 257 S.E.2d at 567. The North Carolina court held:

> The problem here presented arises because [the felony murder aggravating] circumstance is inherent in, and a necessary element of, the capital felony, to-wit, felony murder.
>
> ... A defendant convicted of a felony murder, nothing else appearing, will have one aggravating circumstance "pending" for no other reason than the nature of the conviction. On the other hand, a defendant convicted of a premeditated and deliberated killing, nothing else appearing, enters the sentencing phase

with no strikes against him. This is highly incongruous, particularly in light of the fact that the felony murder may have been unintentional, whereas, a premeditated murder is, by definition, intentional and preconceived.

. . . .

We are of the opinion that, nothing else appearing, the possibility that a defendant convicted of a felony murder will be sentenced to death is disproportionately higher than the possibility that a defendant convicted of a premeditated killing will be sentenced to death due to the "automatic" aggravating circumstance dealing with the underlying felony. To obviate this flaw in the statute, we hold that when a defendant is convicted of first-degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of the trial the aggravating circumstance concerning the underlying felony.

*State v. Cherry*, 298 N.C. at 113, 257 S.E.2d at 567–68. *See also, State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981); *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183 (1981).

In *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the United States Supreme Court said that in order to comply with the Eighth Amendment, aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.*, 462 U.S. at 877, 103 S.Ct. at 2742, 77 L.Ed.2d at 249–50. It seems obvious that Tennessee's statute fails to narrow the class of persons eligible for the death penalty because:

> Automatically instructing the sentencing body on the underlying felony in a felony-murder case does nothing to aid the jury in its task of distinguishing between first-degree homicides and defendants for the purpose of imposing the death penalty. Relevant distinctions dim, since all participants in a felony-murder, regardless of varying degrees of culpability, enter the sentencing stage with at least one aggravating factor against them.

. . . .

> A comparison of the sentencing treatments afforded first-degree-murder defendants further highlights the impropriety of using the underlying felony to aggravate felony-murder. The felony murderer, in contrast to the premeditated murderer, enters the sentencing stage with one aggravating circumstance automatically charged against him. This disparity in sentencing treatment bears no relationship to legitimate distinguishing features upon which the death penalty might constitutionally rest.

*Engberg v. State*, 686 P.2d 541, 560 (Wyo. 1984) (Rose, J., dissenting). *See also Wiley v. Mississippi*, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986) (Marshall, J., dissenting); *Engberg v. Meyer*, 820 P.2d 70 (Wyo. 1991) (adopting Justice Rose's position).

In his thoughtful article analyzing the jurisprudence of death, Professor Richard Rosen correctly notes that the movement by the U.S. Supreme Court to constitutionally narrow the class of persons eligible for the death penalty began in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a case in which a majority of the Justices held the existing systems of capital punishment constitutionally deficient at that time. Richard A. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death*, 31 B.C.L.Rev. 1103, 1106 (1990). The pre-*Furman* capital sentencing statutes in the various states were similar in that the defendant was made eligible for capital punishment by the substantive law of homicide. *Id.*, 31 B.C.L.Rev. at 1107. After a guilty finding, then the sentencer, usually as part of the same proceeding, was given unfettered discretion to impose the death penalty. *Id.*, 31 B.C.L.Rev. at 1107–08. The Justices in the majority in *Furman* focused on the random, arbitrary, capricious, and discriminatory application of the death penalty under these statutes. *Id.*, 31 B.C.L.Rev. at 1108.

In reviewing the statutes passed by states since *Furman,* the Court's focus has been on the process of selecting those to be killed, with the over-arching goal of ensuring that those defendants chosen for execution be in some way worse, or materially more depraved, than those other first-degree murderers not executed. *Id.,* 31 B.C.L.Rev. at 1109–10 (citing *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398, 409 (1980)). The Court has relied primarily on procedural protections to realize its Eighth Amendment goals. *Id.,* 31 B.C.L.Rev. at 1110. A state first must narrow the class of homicide defendants who are eligible for the death penalty to ensure that even if some materially more depraved murderers manage to avoid the death penalty, those chosen will, at least, be among the worst offenders. *Id.* This narrowing, however, is insufficient by itself to satisfy the Eighth Amendment. *Id.*

■ The Court has prohibited a mandatory death penalty for even the narrowest class of murder defendants. *See, e.g., Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987). Instead, after restricting the class of death-eligible offenses, a state must utilize additional procedures that assure reliability in the determination that death is the appropriate punishment in a given capital case. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

■ To meet this reliability requirement, a state must permit the sentencer to make an individualized determination on the basis of the character of the individual and the circumstances of the crime. *Zant v. Stephens, supra,* 462 U.S. at 879, 103 S.Ct. at 2744, 77 L.Ed.2d at 251 (1983). The defendant thus is entitled to present and have the sentencer fully consider all relevant evidence in mitigation of sentence. *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1, 6 (1986). The state also is allowed, but not required, to present a wide range of evidence in aggravation, as long as it is relevant to the sentencing decision and promotes the reliability of that determination.

*See, e.g., Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). In theory, both the restriction of discretion attendant upon the narrowing requirement and the increase in discretion caused by the full and unfettered consideration of mitigation, serve the underlying goal of weeding out those who do not convincingly deserve the death penalty. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death,* 31 B.C.L.Rev. at 1111.

■ As a constitutionally necessary first step under the Eighth Amendment, the Supreme Court has required the states to narrow the sentencers' consideration of the death penalty to a smaller, more culpable class of homicide defendants than the pre-*Furman* class of death-eligible murderers. *See Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). A state, however, must not only genuinely narrow the class of death eligible defendants, but must do so in a way that reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Zant v. Stephens, supra,* 462 U.S. at 877, 103 S.Ct. at 2742, 77 L.Ed.2d at 249–50. A proper narrowing device, therefore, provides a principled way to distinguish the case in which the death penalty was imposed from the many cases in which it was not, *Godfrey v. Georgia, supra,* 446 U.S. at 433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409, and must differentiate a death penalty case in an objective, even-handed, and substantially rational way from the many murder cases in which the death penalty may not be imposed. *Zant, supra,* 462 U.S. at 879, 103 S.Ct. at 2744, 77 L.Ed.2d at 251. As a result, a proper narrowing device insures that, even though some defendants who fall within the restricted class of death-eligible defendants manage to avoid the death penalty, those who receive it will be among the worst murderers—those whose crimes are particularly serious, or for which the death penalty is peculiarly appropriate. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

The critical role played by this narrowing requirement is especially significant in

light of the discretion which the Court has mandated for the sentencing body in a capital case. Because a capital sentencer now must be allowed wide discretion—a discretion not unlike that used before *Furman*—to impose a life sentence based upon any mitigating evidence concerning the character of the defendant or the circumstances of the crime, the sentencer should be restricted to using this discretion on a class of murderers that is demonstrably smaller and more blame worthy than the class of pre-*Furman* murderers eligible for the death penalty.

States have adopted different methods to narrow the class of death-eligible defendants, but in the large majority of states, the class is narrowed by aggravating circumstances. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death,* 31 B.C.L.Rev. at 1122. Tennessee has not chosen to narrow the class of death-eligible defendants by re-defining its murder statute, but rather has chosen to do so by listing a number of specific aggravating factors and expressly requiring the finding of a least one aggravating circumstance beyond a reasonable doubt before the death penalty can be imposed. It joins 24 other states in that requirement. Special Project, *Capital Punishment in 1984: Abandoning the Pursuit of Fairness and Consistency,* 69 Cornell L.Rev. 1129, 1240, n. 732 (1984).

A few states have chosen to narrow the class of death-eligible defendants by providing restrictive definitions of first-degree, or capital, murder. Rosen, *Felony Murder,* 31 B.C.L.Rev. at 1123. In *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme Court approved this alternative approach, holding that no requirement existed for narrowing the class at the sentencing stage, provided that the class of death-eligible defendants is, in fact, genuinely narrowed at the definitional stage. *Id.,* 484 U.S. at 244–46, 108 S.Ct. at 554–55, 98 L.Ed.2d at 581–83. Recognizing that Tennessee has not chosen to narrow at the definitional stage, it

should be noted that the legislature has, in fact, broadened its first-degree murder statute by adding death by child abuse, which makes the class even larger than pre-*Furman.* *See* Tenn.Code Ann. § 39-2-202(a)(2) (Supp.1988) and Tenn.Code Ann. § 39-13-202(a)(4) (1991). *But see State v. Hale,* 840 S.W.2d 307 (Tenn.1992), in which this Court held the statute unconstitutionally deprived the defendant of due process under Article I, § 8 of the Tennessee Constitution.

In addition to having different methods for narrowing the class of death eligible defendants, states have different definitions of first-degree felony murder. As noted earlier, some states are pure felony murder states; that is, they allow the defendants to be sentenced to death solely because the killing took place during an accompanying felony. Tennessee was one of those states before 1989[7]. In these states, a defendant first can be convicted of first-degree murder because of the felony. Then, the defendant can be sentenced to death because the felony is used as an aggravating circumstance, unqualified at either stage by any *mens rea* requirement. Rosen, *Felony Murder,* 31 B.C.L.Rev. at 1125–26.

Rosen points out that in those states, which includes Tennessee,

the felony murder narrowing device fails to meet both the quantitative and qualitative requirements for a narrowing device. It provides no meaningful narrowing and, to the extent that narrowing does exist, it does not serve to identify the defendants most deserving of death. In these states, felony murderers are treated essentially the same as they were pre-*Furman* ... the simple fact of the accompanying felony makes the defendant death-eligible [and] the jury then can exercise its unfettered discretion to determine whether defendant is to live or die.

*Id.,* 31 B.C.L.Rev. at 1127.

Commentators have always criticized the felony murder rule for its bootstrapping

7. The Tennessee legislature amended its capital punishment statute, effective November 1, 1989, to require recklessness during the felony before death can be imposed, thereby removing Tennessee from the class of pure felony murder states. *See supra* note 6 and accompanying text.

effect. *Id.* It vaults an offense into the class of murders without the malice finding usually required, and then, still without any culpability finding, elevates what otherwise might not be a murder to first-degree murder. *Id.* In addition, in pure felony murder states, such as Tennessee before 1989, a third level of bootstrapping arises as the felony murder defendant is moved up into the supposedly restricted class of defendants eligible for death. *Id.*

The perverse result of the felony murder narrowing device is even more troubling because the usual class of first-degree murderers is made up largely of two groups of defendants—felony murderers and premeditated and deliberated murderers. The only defendants who are eliminated by the felony murder narrowing device are those who kill with premeditation and deliberation—i.e., in cold blood—but not during the course of a felony. A simple felony murder unaccompanied by any other aggravating factor is not worse than a simple, premeditated, and deliberate murder. If anything, the latter, which by definition involves a killing in cold blood, involves more culpability.

A few states qualify their felony murder narrowing devices by requiring that the defendant possess a specified *mens rea* of recklessness or culpable negligence at either the guilt or sentencing stage. Tennessee has done so since 1989. *See* 1989 Tenn. Pub.Acts, ch. 591, § 1. All felony murderers, however, potentially meet a recklessness standard; that is, one who purposely undertakes a felony that results in a death, almost always can be found reckless. Therefore, the narrowing devices in these states are essentially no different from those in the pure felony murder states.

■ Furthermore, the Supreme Court case of *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), now places a nationwide threshold of culpability at the reckless indifference level, meaning that a defendant who acts without reckless indifference is not constitutionally eligible for the death penalty. *Id.*, 481 U.S. at 157–58, 107 S.Ct. at 1687–88, 95 L.Ed.2d at 144–45. Therefore, since the absence of reckless indifference constitutionally immunizes a defendant from the death penalty, its presence cannot meaningfully further narrow the class of death-eligible defendants.

In *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.1985), the 8th Circuit Court of Appeals relied on *Zant, supra,* and the principles of *Godfrey, supra,* to hold that duplication by an aggravating circumstance of the underlying capital felony violated the Eighth Amendment of the U.S. Constitution.[8] The Court commented:

> The question, rather, is whether use of an aggravating circumstance that duplicates an element of crime itself is a violation of the Eighth Amendment, as applied to the states by the Due Process Clause of the Fourteenth Amendment. Two recent Supreme court opinions, *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion), and *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), clearly indicate that such a violation has occurred here. Aggravating circumstances, in order to comply with the Eighth Amendment, must "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.* [462 U.S. at 875–878,] 103 S.Ct. at 2742–43 (footnote omitted). An aggravating circumstance is an objective criterion that can be used to distinguish a particular defendant on whom the jury has decided to impose the death sentence from other defendants who have committed the same underlying capital crime. Aggravating circumstances serve to reduce the danger that the death penalty will be

---

8. *Collins* involved the Arkansas death penalty statute existing in 1974, which defined certain kinds of murder as capital, and used aggravating circumstances to let the jury determine whether the death penalty should be imposed. *Collins* was subsequently deemed to have been overruled by *Lowenfield v. Phelps, supra,* on the basis that the Arkansas statute sufficiently narrowed the class of death eligible defendants by narrowly defining capital murder. *Perry v. Lockhart,* 871 F.2d 1384, 1393 (8th Cir.1989).

wantonly or arbitrarily imposed, a danger that was uppermost in the Court's mind when *Furman v. Georgia* ... was decided....

We see no escape from the conclusion that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform this narrowing function.

*Id.,* 754 F.2d at 263–64.

This Court has previously refused to follow the *Collins* rationale by finding it inapplicable under the Tennessee Constitution. *See State v. Smith,* 755 S.W.2d 757, 768 (Tenn.1988); *State v. King,* 694 S.W.2d 941, 946 (Tenn.1985); *State v. Laney,* 654 S.W.2d 383, 387 (Tenn.1983); and *State v. Pritchett,* 621 S.W.2d 127, 139–40 (Tenn. 1981). In *State v. Smith, supra,* the Court's reason for rejecting the *Collins* rationale was as follows:

This precise question, however, was before the Supreme Court of the United States in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), *cert. granted* 483 U.S. 1005, 107 S.Ct. 3227, 97 L.Ed.2d 734 (1987). There the Court upheld the position that we have taken herein and in *Pritchett* and *King, supra,* that use of the underlying felony, in this case armed robbery, as an aggravating circumstance upon which the jury may base a death penalty is constitutionally permissible.

*Id.,* 755 S.W.2d at 768.

The difficulty with that conclusion is that in *Lowenfield v. Phelps, supra,* the United States Supreme Court held that the Louisiana death penalty statute sufficiently narrowed the class of death eligible murderers by narrowly defining capital murder so that the class of death eligible defendants did not have to be further narrowed by aggravating circumstances. 484 U.S. at 244–46, 108 S.Ct. at 554–55, 98 L.Ed.2d at 581–83. Since the statute sufficiently narrowed the class of death eligible by narrowly defining capital murder, the Court upheld the constitutionality of the Louisiana statute, despite the fact that the sole aggravating circumstance found was identical to an element of the capital crime of

which the petitioner had been convicted. *Id.*

In upholding the Louisiana statute, the Court concluded that the narrowing function required may be performed by jury findings at either the sentencing phase of the trial or the guilt phase, and that the legislature may itself narrow the definition of capital offenses, as Louisiana has done, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase. *Id.,* 484 U.S. at 244–45, 108 S.Ct. at 554, 98 L.Ed.2d at 581–82.

It is clear that Tennessee has a broad definition of murder and has not narrowed in the definitional stage. Accordingly, *Lowenfield* is inapposite and provides no rationale for constitutionality under the Tennessee Constitution.

■ We have determined that in light of the broad definition of felony murder and the duplicating language of the felony murder aggravating circumstance, no narrowing occurs under Tennessee's first-degree murder statute. We hold that, when the defendant is convicted of first-degree murder solely on the basis of felony murder, the aggravating circumstance set out in Tenn.Code Ann. §§ 39–2–203(i)(7) (1982) and 39–13–204(i)(7) (1991), does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution because it duplicates the elements of the offense. As a result, we conclude that Tenn.Code Ann. § 39–2–203(i)(7) is unconstitutionally applied under the Eighth Amendment to the U.S. Constitution and Article I, § 16 of the Tennessee Constitution where the death penalty is imposed for felony murder. Accordingly, we expressly overrule *State v. Smith,* 755 S.W.2d 757 (Tenn.1988), and its progeny on this issue.

As stated at the beginning of this Opinion, under our holding today, felony murder continues to be a death-eligible offense. However, a finding of an aggravating circumstance other than Tenn.Code Ann. § 39–2–203(i)(7) (1982) and § 39–13–204(i)(7)

(1991) is necessary to support death as a penalty for that crime.

 Because, in this case, the jury has found two aggravating circumstances are supported by the evidence beyond a reasonable doubt, it is necessary for this case to be remanded for re-sentencing. Even though the evidence amply supports the aggravating circumstance of the murder being especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn.Code Ann. § 39–2–203(i)(5) (1982), we are unable to conclude that the elimination of the aggravating circumstance (i)(7) is harmless error beyond a reasonable doubt. Therefore, we remand this case for re-sentencing where the State will be free to reseek the death penalty if it so desires. The costs of this appeal are taxed to the State of Tennessee.

DROWOTA and O'BRIEN, JJ., concurring in Parts I and II and dissenting in Part III. See separate Opinion.

REID, C.J., and DAUGHTREY, J., concurring in Parts I and III and dissenting in Part II. See separate Opinion.

DROWOTA, Justice, concurring and dissenting.

I would affirm the Defendant's conviction of first-degree felony murder and his sentence of death; therefore, I concur in part and dissent in part. I concur with Part I of Justice Anderson's majority opinion, in which all members of this Court find that there is no error in the guilt phase. I also concur with Part II of Justice Anderson's opinion, in which he finds the death penalty may constitutionally be imposed upon conviction under the felony-murder statute, T.C.A. § 39–2–202(a) (1982). As the majority opinion reveals, the Defendant did not raise the issue of the constitutionality of Tennessee's death penalty statute as punishment for felony murder. However, we wish to address this question because the present Court has not yet considered this important issue. As members of the former Court, Justice O'Brien and I have previously upheld the constitutionality of capital punishment for felony murder. Today, a three-member

majority of the present Court reaffirms the prior holdings of this Court on this issue, beginning with *State v. Dicks*, 615 S.W.2d 126 (1981).

I would like to acknowledge that, although prior decisions of this Court have held the death penalty in felony murder to be constitutional, no former opinion of this Court has articulated in such depth and scholarly manner the issue now before us, as has Justice Anderson in Part II of this opinion. The dissent of Chief Justice Reid, joined by Justice Daughtrey, to Part II of the majority opinion states: "[T]he statute still does not effectively limit the class of *death-eligible* defendants (which is a group different from those actually executed) to those most deserving of death as punishment and, therefore, it violates the Tennessee constitutional prohibition against cruel and unusual punishment." I respond only by saying I respectfully disagree with the analysis found in the dissent filed by my colleagues, including the simplistic categorization of cases based on the presence of intent to kill.

I dissent from Part III of the majority opinion which holds that use of the aggravating circumstance in T.C.A. § 39–2–203(i)(7) (1982) [now § 39–13–204(i)(7) (1991)] to impose a sentence of death in cases of felony murder violates the Eighth Amendment to the United States Constitution and Article I, § 16, of the Tennessee Constitution. This same position, under the various guises of double jeopardy, mandatory death penalty and inadequate narrowing, has previously been rejected by this Court. *See, e.g., State v. Smith*, 755 S.W.2d 757, 768 (Tenn.1988); *State v. Barnes*, 703 S.W.2d 611, 618 (Tenn.1985); *State v. Zagorski*, 701 S.W.2d 808, 816 (Tenn.1985); *State v. Smith*, 695 S.W.2d 954, 959–960 (Tenn.1985); *State v. King*, 694 S.W.2d 941, 946 (Tenn.1985); *State v. Laney*, 654 S.W.2d 383, 387 (Tenn.1983); *State v. Pritchett*, 621 S.W.2d 127, 139–141 (Tenn.1981); *Houston v. State*, 593 S.W.2d 267, 276 (Tenn.1980). In *State v. Pritchett*, 621 S.W.2d at 140–141, the Court rejected the rationale of *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979), now adopted by

the Court; and in *State v. Smith,* 755 S.W.2d at 768, we held that our statute complied with the constitutional requirement of "narrowing" under *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

No intervening law compels that we abandon these former decisions. I find disturbing the tendency of members of this Court to disregard long established precedents in capital punishment decisions. Consistency in the law is of utmost importance, particularly in this area of the law. Inconsistency creates questions and concerns that leave the bench and bar without any confidence that what was said yesterday will hold true for tomorrow.

My disagreement with the majority is not based solely on the principle of *stare decisis,* however. It also arises from my conviction that these previous decisions are not in error and that the statute does not contravene the requirements of either the Eighth Amendment or Article I, § 16. As was pointed out in *Pritchett,* the United States Supreme Court has implicitly approved an identical application of the felony element of the offense of felony murder as a valid aggravating circumstance for imposition of the death penalty in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). There the Court held that the Florida capital sentencing system, upon which our statute was in part closely modeled, on its face satisfied the constitutional deficiencies identified in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *Cf. Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (upholding death penalty under Georgia statute effectively allowing similar duplication under the facts of the case). The United States Supreme Court has also explicitly held that there is no Eighth Amendment prohibition against using an element necessary to the conviction of first-degree murder as an aggravating circumstance to support the death penalty. *Lowenfield v. Phelps, supra; see also State v. Cauthern,* 778 S.W.2d 39, 47 (Tenn.1989).

The majority, however, finds that the statute fails to "narrow" the class of death eligible defendants sufficiently to satisfy the cruel and unusual clauses of the two constitutions because, in the case of felony murder, the statute returns our sentencing scheme to the days before *Furman,* when the jury was given unfettered discretion to determine who lived and who died. This is neither a correct assessment of the statute nor of *Furman* and its progeny. The concern in *Furman* was that the death penalty not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. *Gregg v. Georgia,* 428 U.S. at 188, 96 S.Ct. at 2932. Its guiding principle was that the sentencer's discretion must be suitably directed and limited and must be exercised in an informed manner. *Id.* at 189, 96 S.Ct. at 2932. The sentencer must have relevant information under fair procedural rules and be provided with standards to guide its use of this information. *Id.* at 195, 96 S.Ct. at 2935. As stated in *Proffitt v. Florida,* "the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." 428 U.S. at 258, 96 S.Ct. at 2969.

*Furman* nowhere mentions the concept of "narrowing" as understood by the majority. Aggravating factors are considered "means of confining the sentencers' discretion—giving them something specific to look for rather than leaving them to wander at large among all aggravating circumstances." *Walton v. Arizona,* 497 U.S. 639, 650, 110 S.Ct. 3047, 3063, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring). So long as the aggravating circumstance is not unconstitutionally vague, i.e., so vague as to fail adequately to channel the sentencing patterns of juries, it may serve as the basis for imposing capital punishment. *See Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983).

But aggravating factors are not the only component of a capital sentencing system assuring that the commands of *Furman* are met. The system must be examined as

a whole just as it works as a whole. In addition to aggravating factors, our statute further guides and channels the sentencer's discretion by providing a bifurcated proceeding, requiring consideration of mitigating circumstances, explicitly directing the manner in which the jury must weigh the various sentencing factors, and mandating meaningful appellate review. *See Zant v. Stephens*, 462 U.S. at 875, 103 S.Ct. at 2741; *Proffitt v. Florida*, 428 U.S. at 252–253, 96 S.Ct. at 2967; *Gregg v. Georgia*, 428 U.S. at 191, 96 S.Ct. at 2933. The cumulative effect of these procedural safeguards assures that our statute's use of the underlying felony as an aggravating circumstance does not violate the principles of *Furman.*

As its reliance on the quoted language from *State v. Cherry* discloses, the majority decision is based to a large extent upon the potential problems of disproportionality inherent in allowing capital punishment for felony murder. Allowing the underlying felony to act as an aggravating circumstance does not, however, result in imposition of the death penalty in a disproportionate manner. First of all, it is well-settled that under the Eighth Amendment death is not a disproportionate punishment for felony murder so long as the defendant in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used, or the defendant was a major participant in the felony and exhibited reckless indifference to human life. *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376–3377, 73 L.Ed.2d 1140 (1982). Yet the majority's decision removes wholesale this category of persons [1], unquestionably death eligible under the Eighth Amendment, from the list of those upon whom the state can impose capital punishment unless some factor beyond the commission of the

felony is present in the crime. I cannot, however, consider "unreasonable, unjust or unconstitutional" the legislature's determination that killings perpetrated during a felony occur under circumstances of enhanced culpability sufficient to expose the perpetrator and certain accomplices to a death sentence. *See Whalen v. State*, 492 A.2d 552, 567 (Del.1985). I believe that, applied under the constitutional restrictions set forth in *Tison* and *Enmund*, T.C.A. § 39–2–203(i)(7) constitutionally narrows the category of death eligible defendants in the case of felony murder at the sentencing stage. To the extent that the majority's decision rests upon concerns that the death penalty is disproportionate punishment for some types of conduct falling under the felony murder statute, our sentencing system, created to meet the mandates of *Furman*, may be trusted to discern and remove those persons perpetrating these less egregious forms of felony murder from the list of those condemned to death.

It is here that this Court's obligations under T.C.A. § 39–13–206 [formerly § 39–2–205] become critical. In order to prevent the execution of all but the most deserving of murderers and to avoid arbitrary and capricious sentencing, the Court reviews all felony-murder cases to assure that a sentence of death has not been arbitrarily imposed, that the evidence supports the jury's findings and that the sentence of death is not disproportionate. For purposes of the death penalty, a distinction must be drawn in felony-murders between cold-blooded, execution-style murders and accidental, unforeseen killings or accomplice killings. However, the mechanical narrowing adopted by the Court today bears no relationship to these considerations.[2] Following a jurisprudence of case specific proportionality review, on the other hand, ensures that the dictates of the Eighth and Four-

---

1. *See, e.g., State v. Smith*, 695 S.W.2d 954 (1985); *State v. Matson*, 666 S.W.2d 41 (Tenn. 1984); *State v. Laney*, 654 S.W.2d 383 (Tenn. 1983); *State v. Simon*, 635 S.W.2d 498 (Tenn. 1982). In the above felony murder cases, the sole aggravating factor was (i)(7).

2. In disallowing the jury from considering aggravating circumstance (i)(7) at the sentencing stage in all felony murder convictions, over one third of the persons on death row may have their sentences reviewed, first for a harmless error analysis, and upon a finding of harmful error as in this case, then for a remand to the trial court for resentencing.

teenth Amendments and their state counterparts, Article I, §§ 16 and 8, are met in capital felony murders.

Applying these principles to the present case, I would find: that the sentence of death was not imposed in an arbitrary fashion; that the evidence supports the jury's findings of two statutory aggravating circumstances; and that the evidence supports the jury's finding of the absence of mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found. The sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. *See State v. Alley,* 776 S.W.2d 506 (Tenn.1989); *State v. Miller,* 771 S.W.2d 401 (Tenn.1989); *State v. West,* 767 S.W.2d 387 (Tenn.1989); *State v. Hartman,* 703 S.W.2d 106 (Tenn.1985); *State v. Coe,* 655 S.W.2d 903 (Tenn.1983); *State v. Groseclose,* 615 S.W.2d 142 (Tenn.1981). The defendant's culpability also meets the criteria of *Tison* and *Enmund, supra.* The aggravating circumstances applied are constitutionally valid. This torture-murder of a kidnapped child unquestionably is one of the most aggravated killings that this Court has seen. The fourteen-year-old victim's ordeal, as described in the majority opinion, began at 7:30 p.m. and ended at 11 p.m. This brutal and tragic murder is certainly one of the "worst of the bad."

I would affirm the judgment both as to the defendant's guilt and his sentence of death. I am authorized to state that Justice O'BRIEN concurs in this opinion.

REID, Chief Justice, concurring and dissenting.

I concur in Part I of the majority Opinion affirming the conviction of first degree murder.

My position with regard to Part II is that even if the death penalty is not *per se* cruel and unusual punishment prohibited by Article I, Section 16 of the Tennessee Constitution, the imposition of death upon a conviction of felony murder is not a single constitutional issue that can be resolved "in the abstract"; Article I, Section 16 imposes a standard of proof higher than the federal standard of reckless indifference; and, therefore, T.C.A. § 39–2–203 (1982), as construed in the majority Opinion violates Article I, Section 16.

I concur in Part III of the majority Opinion's holding that the use of felony murder as an aggravating circumstance when the offense of which the defendant is convicted is *felony murder* does not accomplish the constitutional objective of narrowing the class of death-eligible murderers, and therefore T.C.A. § 39–13–204(i)(7) is constitutionally invalid.

This holding based on Article I, Section 16 of the Tennessee Constitution is a step toward limiting the jury's discretion in imposing capital punishment to a "demonstrably smaller and more blameworthy" class of murderers. *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). However, even with the felony murder aggravating circumstance eliminated, the Tennessee sentencing statute still includes in the class of death-eligible defendants accidental and unintentional murderers whose culpability is minimal. It still allows convictions for first degree felony murder of persons who killed accidentally or unintentionally and those who did not kill, did not intend to kill and did not intend that any person suffer any physical harm. The statute still does not effectively limit the class of *death-eligible* defendants (which is a group different from those actually executed) to those most deserving of death as punishment and, therefore, it violates the Tennessee constitutional prohibition against cruel and unusual punishment. Consequently, the statute falls short of the constitutional mandate that the death penalty be imposed upon only those murderers who are the "worst of the bad."

The evil identified by the United States Supreme Court cases construing and implementing the Eighth Amendment prohibition against cruel and unusual punishment is not the death penalty itself but, as discussed in the majority Opinion, the random, arbitrary, capricious, and discriminatory

application of the death penalty. So long as a state under its law elects to impose the death penalty, the United States Constitution mandates fairness and proportionality in the imposition. The procedure followed by a state must, as stated in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 554 (quoting *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)), "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." The constitutional objective is that the sentence imposed "reflect a reasoned *moral* response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 318, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987)) (concurring opinion) (emphasis in original).

The United States Supreme Court has recognized that this "reasoned moral response" is determined by "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 99, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958). *See State v. Black*, 815 S.W.2d 166, 188 (Tenn.1991). The standards of decency are reflections of the essential character of the people of the state, their virtues, their faults. To be constitutional, the process must insure the effective application of society's present standards of decency. Implicit in death penalty jurisprudence is the recognition that the standards of decency are not static but evolving, that society is not stale but maturing, and that the level of community morality will continue to rise until the reasoned moral response of the people of Tennessee will be, if it is not already, that the death penalty is cruel and unusual punishment. Until that standard is recognized, the focus must be on fairness and proportionality among those that the process allows to be executed.

The process whereby the death penalty may be imposed in Tennessee consists of three stages—the determination that the defendant is not in a category of murderers upon whom the death penalty may not be imposed regardless of the other circumstances of the case; the minimum proof regarding the defendant and the crime that will support a jury's imposition of the death penalty; and the comparative proportionality review on appeal mandated by statute.

Certain categories of defendants are not subject to the death penalty regardless of the circumstances of the murder. T.C.A. § 39–13–204 limits the imposition of the death penalty to the offense of first degree murder. T.C.A. § 39–13–203 prohibits the imposition of a sentence of death upon any mentally retarded defendant. T.C.A. § 37–1–134–(a)(1)(A) protects juveniles from the sentence of death. This decision adds to those categories in which the defendant is not death-eligible: those charged only with felony murder with felony murder as the only aggravating circumstance.

The second stage is the jury trial. Juries may impose the death penalty only upon those defendants who are members of the class of death eligibles. In cases in which the defendant is not in a category exempt from the sentence of death, the minimum standards for determining whether a sentence of death may be constitutionally imposed for felony murder under the federal constitution are those set by the United States Supreme Court in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Those cases dealt with the problem of imposing the death penalty in cases of vicarious liability for felony murder, i.e., where an accomplice in the felony, one who did not actually kill the victim, is convicted of murder under the felony murder doctrine and receives the death penalty. Under the rules of those cases the death penalty is only permissible under the Eighth and Fourteenth Amendments for one who himself kills, attempts to kill, or intends that a killing take place or that lethal force will be imposed (*Enmund*), or for one whose personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life (*Tison*).

As discussed in the majority Opinion, Tennessee does not narrow the death-eligible class by the statutory definition of first-degree felony murder. Under the Tennessee felony statute, proof of malice, deliberation, and premeditation, or that the defendant intended to kill the victim, is not necessary to support a death sentence. *State v. Johnson,* 661 S.W.2d 854, 861 (Tenn. 1983); *Farmer v. State,* 201 Tenn. 107, 296 S.W.2d 879 (1956); *State v. Hopper,* 695 S.W.2d 530, 535 (Tenn.Crim.App.1985); *Tosh v. State,* 527 S.W.2d 146, 147–48 (Tenn.Crim.App.1975). Consequently, there are included in the class of death-eligible felony murderers those who killed accidentally or unintentionally and those who did not kill, did not intend to kill, and did not intend that any person suffer physical harm. Since the felony murder statute by definition does not narrow the class of death-eligible defendants, narrowing must be accomplished, if at all, at the sentencing phase of the trial when the jury, pursuant to T.C.A. § 39–13–204(i), (j), considers the relevant aggravating and mitigating circumstances.

The majority Opinion presents a compelling case for its conclusion that to be constitutional a sentencing process must insure that only those defendants "most deserving" will be executed. It states that in selecting those defendants to be executed the over-reaching goal is to insure that those chosen be in some way worse or materially more depraved than those other first degree murderers not executed. *See* majority Opinion at 343. The Opinion recognizes that in order to pass constitutional muster the procedure "first must narrow" the class of death-eligible defendants to insure that those executed "will be among the worst offenders," and, further, acknowledges that the reckless indifference standard accomplishes no meaningful limitation on the class of defendants eligible for the death penalty. However, rather than stating the quantum of proof required by the constitution to genuinely narrow the class of death eligibles and thus support a jury verdict imposing the death sentence, it invalidates as unconstitutional only that section of the statute that allows felony murder as an aggravating circumstance for the conviction of felony murder. The rationale is that "T.C.A. §§ 39–2–203(i)(7) (1982) and 39–13–204(i)(7) (1991) do not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U.S. Constitution and Article I, Section 16 of the Tennessee Constitution because they duplicate the elements of the offense." *Id.* at 346. It should be noted that the constitutional deficiency is that the aggravating circumstance does not narrow the class, not that it duplicates the elements of the offense. Justice Drowota's dissent misses this essential point, stating, "There is no constitutional prohibition against using an element of the offense as an aggravating circumstance." Drowota, J., dissenting at 348. The result then is illogical: an aggravating circumstance that fails to narrow the class because it duplicates the elements of the offense is unconstitutional, but aggravating circumstances that fail to narrow the class for other reasons are not unconstitutional. The logical conclusion from the majority Opinion's analysis would be that any provision of the statute that fails to accomplish the constitutional imperative to narrow the class is invalid.

The Opinion acknowledges that the felony murder doctrine has been severely criticized as being harsh and unjust and that in most jurisdictions in which felony murder has not been abolished, the death penalty can be imposed only where killings perpetuated during felonies are intentional, deliberate, purposeful, or knowing. *Id.* at 337. The Opinion, however, finds that death as a penalty for felony murder conforms with contemporary standards of decency in Tennessee and, therefore, that "in the abstract" the sentence of death for felony murder is not *per se* cruel and unusual punishment. The standards of decency supporting this conclusion, the Opinion says, are evidenced by the act of the legislature enacting the statute and the acts of juries imposing that penalty in felony murder cases. At the appropriate time, this subject should be fully discussed. Perhaps sufficient for the present are the observations that the legislature is essentially a

political body and that citizens who refuse to consider the sentence of death as punishment are disqualified as jurors. In addition, the legislature enacted that portion of the statute, T.C.A. § 39–13–204(i)(7), found by the majority Opinion to be unconstitutional and the jury imposed the sentence of death on the defendant in this case based upon that statute. This evidence hardly supports the conclusion that imposing the death penalty upon a felony murder conviction does not *per se* violate Article I, Section 16. More importantly, that conclusion does not preclude consideration of those cases in which the imposition of the death penalty does constitute cruel and unusual punishment and it does not relieve the Court of the responsibility for determining the proof necessary to support a jury's sentence of death. Without this standard, prosecutors can continue to seek the death penalty and juries can continue to impose the death penalty upon no greater proof than that of reckless indifference.

In determining that standard, the Court need look no further than its reported decisions. Without independently examining the requirements of the state constitution, this Court has, by its decisions, recognized a higher standard of culpability than that of reckless indifference set by the United States Supreme Court. Analysis of our cases indicates that this Court, while not specifically adopting a bright-line rule, has found that a felony murderer is death eligi-

ble only where the killing is deliberate or intentional or accompanied by a conscious purpose of producing death or a conscious realization that death will likely occur. Since 1979, this Court has reviewed and released opinions in approximately 84 cases in which the jury imposed a sentence of death. Review of these opinions shows that the sentence was clearly based only on a conviction of felony murder in 28 cases.[1] The proof in 16 of those 28 cases shows an intent to kill.[2] In six of the cases proof of the method of killing or other evidence would support a finding of intent to kill,[3] even though the issue was disputed. Two cases involved struggles in which the intent to kill was not clearly shown,[4] in one case the defendant confessed to the killing,[5] and one case is on remand.[6] In only two of the 28 felony murder convictions is the intent to kill seriously in doubt.[7]

The conclusion to be gathered from a review of these cases is that the jury verdicts imposing the death penalty upon convictions of felony murder were supported by proof that the killings were the proximate result of acts accompanied by an intent to kill, a conscious purpose to produce death, or a conscious realization that death likely would occur. This standard requires an intent with respect to the *killing*, not just the underlying felony, and reflects a moral culpability greater than reckless indifference. I would hold that Article I,

1. *State v. Boyd,* 797 S.W.2d 589 (Tenn.1990); *State v. Cauthern,* 778 S.W.2d 39 (Tenn.1989); *State v. Taylor,* 774 S.W.2d 163 (Tenn.1989); *State v. Irick,* 762 S.W.2d 121 (Tenn.1988); *State v. Hines,* 758 S.W.2d 515 (Tenn.1988); *State v. Smith,* 755 S.W.2d 757 (Tenn.1988); *State v. Poe,* 755 S.W.2d 41 (Tenn.1988); *State v. Barber,* 753 S.W.2d 659 (Tenn.1988); *State v. Bobo,* 727 S.W.2d 945 (Tenn.1987); *State v. Sparks,* 727 S.W.2d 480 (Tenn.1987); *State v. King,* 718 S.W.2d 241 (Tenn.1986); *State v. Goad,* 707 S.W.2d 846 (Tenn.1986); *State v. Barnes,* 703 S.W.2d 611 (Tenn.1985); *State v. Hartman,* 703 S.W.2d 106 (Tenn.1985); *State v. Smith,* 695 S.W.2d 954 (Tenn.1985); *State v. King,* 694 S.W.2d 941 (Tenn.1985); *State v. McKay,* 680 S.W.2d 447 (Tenn.1985); *State v. Sample,* 680 S.W.2d 447 (Tenn.1984); *State v. Sheffield,* 676 S.W.2d 542 (Tenn.1984); *State v. Workman,* 667 S.W.2d 44 (Tenn.1984); *State v. Matson,* 666 S.W.2d 41 (Tenn.1984); *State v. Campbell,* 664 S.W.2d 281 (Tenn.1984); *State v. Laney,* 654 S.W.2d 383 (Tenn.1983); *State v. Simon,* 635 S.W.2d 498 (Tenn.1982); *State v. Strouth,* 620 S.W.2d 467 (Tenn.1981); *State v. Coleman,* 619 S.W.2d 112 (Tenn.1981); *State v. Dicks,* 615 S.W.2d 126 (Tenn.1981); *State v. Cozzolino,* 584 S.W.2d 765 (Tenn.1979).

2. *Cauthern; Taylor; Hines; Barber; Sparks; King* (1986); *King* (1985); *McKay; Sample; Sheffield; Matson; Campbell; Simon; Strouth; Dicks; Cozzolino.*

3. *Poe; Bobo; Goad; Laney; Hartman; Workman.*

4. *Boyd; Smith* (1985).

5. *Coleman.*

6. *Smith* (1988).

7. *Irick; Barnes.*

Section 16 requires proof of at least this standard.

At the third stage of the process, sentences of death, based upon sufficient proof as discussed above, are then subject to a case-specific proportionality analysis in which this Court reviews evidence of the defendant's participation in the homicide and his *mens rea* in regard to the homicidal act. *Lockett v. Ohio*, 438 U.S. 586, 612–17, 98 S.Ct. 2954, 2969–71, 57 L.Ed.2d 973 (1978), (Blackmun, J., dissenting). The review focuses on the defendant's character and the circumstances of the crime and thus accomplishes the statutory mandate that this Court determine whether the sentence of death imposed in each case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." T.C.A. § 39–13–206(c)(1)(D). In accomplishing the comparative proportionality review, the Court makes three inquiries: (1) whether the punishment for the crime conforms with contemporary standards of decency, (2) whether the punishment is grossly disproportionate to the offense, and (3) whether the imposition of the death penalty accomplishes any legitimate penological objective. *State v. Black*, 815 S.W.2d 166 (Tenn.1991).

The majority Opinion, despite having found that the constitution requires genuine narrowing of the class of death-eligible defendants and, further, that narrowing may not occur at the sentencing stage, nevertheless states, "We, therefore, reaffirm the rejection of a *per se* proportionality approach in favor of the required statutory proportionality review." Main Opinion at 340. The effect of this decision is that prosecutors may indict and juries may convict on proof of reckless indifference, leaving the constitutional requirement for narrowing to appellate review. Both the majority Opinion and Justice Drowota's dissent agree that the only constitutional safeguard is review by this Court. Main Opinion at 340; Drowota, J., dissenting at 349. It is at the appellate review stage that the process in Tennessee is the most deficient.

The Court is required to perform two distinct functions, in addition to the consideration of the assignments of error. It must determine, upon consideration of the evidence regarding aggravating and mitigating circumstances, whether the proof supports the sentence of death; and it must determine, upon consideration of the nature of the crime and the defendant, whether the sentence is excessive or disproportionate in comparison with the penalty imposed in similar cases. T.C.A. § 39–13–206(c)(1)(A), (B), (C), (D). Essential to the performance of the first function is the determination of the quantum of proof required by the constitution or the statute to impose the death penalty. As previously discussed, the majority Opinion concludes, erroneously in my view, that proof of reckless indifference is sufficient.

Performance of the second function, comparative proportionality review, requires a determination different from that of ascertaining the parameters of the death-eligible class. It requires a consideration not only of the case before the Court but the spectrum of sentences in similar cases throughout the state. *See State v. Harris*, 839 S.W.2d 54 (Tenn.1992), Reid, C.J., dissenting. Unfortunately, the reported decisions do not reflect strict performance of this function because they do not include a disciplined proportionality review. What passes for a comparative proportionality review is essentially a reiteration of the facts surrounding the commission of the offense, followed by a conclusory statement that the death penalty is not disproportionate in that particular case. Only rarely has the Court even reviewed the facts of other cases in which the death penalty has been affirmed. *See e.g., State v. Barber*, 753 S.W.2d 659 (Tenn.1988).

The only way to judge the effectiveness of the death penalty process is to examine the results. If it "includes defendants who are not necessarily more deserving of the death penalty and excludes those who are not necessarily less deserving," the process fails to genuinely narrow the class of death-eligible defendants. Rosen, *Felony Murder and the Eight Amendment Jurisprudence of Death*, 31 B.C.L. Review 1103, 1125 (1990). This determination can be

made only by comparing murderers sentenced to death with those given less severe sentences, a procedure not followed in past reported decisions. The Court obviously has substituted for the proportionality review required at this third stage of the proceedings a finding that the proof shows the defendant to be a member of the death-eligible group which, under the federal constitution and the Tennessee statute, includes all cases in which the proof meets the threshold standard of reckless indifference. This practice is acknowledged by the statement in Justice Drowota's dissent that the death penalty is not disproportionate punishment so long as the reckless indifference standard of *Enmund* and *Tison* is met. Drowota, J., dissenting at 349. Consequently, the Court has not found the punishment disproportionate in *any* of the 84 cases in which the sentence of death has been imposed since 1977. This fact alone would suggest there has been no effective proportionality review on appeal. It also places in doubt Justice Drowota's confident assertion that, "Our sentencing system, created to meet the mandates of *Furman* may be trusted to discern and remove those persons perpetrating these less egregious forms of felony murder from the list of those condemned to death." Drowota, J., dissenting at 349.

The result is that the class of death-eligible defendants is not genuinely narrowed by the statutory definition of felony murder; the sentencing statute by its terms fails to narrow the class; Article I, Section 16, as interpreted by the majority in this decision, does not invalidate those provisions of the statute which do not effect narrowing; and the appellate review mandated by statute has been limited to a finding that the proof meets the threshold standard of reckless indifference.

I concur that the judgment of conviction be affirmed and that the case be remanded for sentencing.

I am authorized to state that Justice DAUGHTREY concurs in this Opinion.

