# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
May 13, 2025 Session

## STATE OF TENNESSEE v. TRAMEISHA L. FARRIS

### Appeal from the Criminal Court for Davidson County
No. 2022-B-1141    Steve R. Dozier, Judge

_____

### No. M2024-01016-CCA-R3-CD

_____

A Davidson County jury convicted the Defendant, Trameisha L. Farris, of first degree felony murder, and the trial court imposed a sentence of life imprisonment. On appeal, the Defendant challenges the legal sufficiency of the evidence supporting her conviction. More specifically, she argues that (1) the evidence is legally insufficient to prove that a robbery occurred; and (2) even assuming that a robbery occurred, the State failed to prove that she participated in that crime. Upon our review, we respectfully disagree with the Defendant and affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgment of the Criminal Court Affirmed

TOM GREENHOLTZ, J., delivered the opinion of the court, in which J. ROSS DYER and KYLE A. HIXSON, JJ., joined.

Manuel B. Russ (on appeal) and James G. King (at trial), Nashville, Tennessee, for the appellant, Trameisha L. Farris.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jenny Charles, Wesley King, and Chantley Frazier, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

# FACTUAL BACKGROUND

This case arises from the fatal shooting of the victim on February 4, 2021, in Davidson County, Tennessee. The Defendant, Trameisha Farris, and her boyfriend and co-defendant, Wilton Alexander, were charged in connection with the incident. The State alleged that the victim had taken possession of a firearm that originally belonged to Mr. Alexander's father and that Mr. Alexander, with the assistance of the Defendant, sought to recover the weapon. According to the prosecution, the Defendant lured the victim into meeting with her under false pretenses, facilitating a confrontation during which Mr. Alexander shot and killed the victim and took the firearm from his body. The following summary outlines the evidence presented at trial.

## A.    THE VICTIM'S MURDER

On February 3, 2021, the Defendant sent flirtatious messages to the victim telling him she thought he was cute. When the victim questioned her advances, the Defendant told him that her boyfriend and co-defendant, Wilton Alexander, "has been in the way," and she was interested in the victim. The victim repeatedly expressed concern about Mr. Alexander finding out about their conversation, but then agreed that he would go to the home of the Defendant's family the next day for an intimate encounter. Eventually, when the victim indicated he could not find transportation, the Defendant arranged to meet him at the residence of his family instead.

The next morning, the Defendant was with Mr. Alexander when he solicited a ride from his friend, Antonio Anthony. Mr. Alexander told Mr. Anthony that he and the Defendant needed a ride so he could "jack" the victim for a gun. Mr. Anthony, who later testified that the term "jack" referred to committing a robbery, agreed to help by using a car that belonged to his girlfriend, Jamaya Broyles. Ms. Broyles accompanied Mr. Anthony during the trip.

After picking up the Defendant and Mr. Alexander, Mr. Anthony drove to the victim's address. When they arrived, Mr. Alexander instructed Mr. Anthony to park down the street rather than in front of the house. Mr. Alexander then instructed the Defendant to enter the residence while he waited outside. During that time, surveillance footage showed Mr. Alexander concealing himself in nearby bushes before briefly returning to the vehicle.

The Defendant stayed in the house for approximately half an hour. At one point, the Defendant walked outside, stood in the front yard for a short time, and went back inside.

After she went back inside, Mr. Alexander again left the vehicle and approached the house, eventually returning to the bushes. The Defendant went outside a second time and began walking towards where Mr. Alexander was hiding. When someone—possibly the victim—emerged onto the porch, she ran back to the front of the house, which prevented Mr. Alexander from being seen.

At some point, the Defendant and the victim began talking on the porch. After talking for a few seconds, the Defendant and the victim started walking to the side of the porch opposite from where Mr. Alexander was hiding. Seconds later, Mr. Alexander left his hiding spot and charged the victim. Three seconds after that, a single fatal gunshot was fired, and the victim fell to the ground.

The Defendant initially ran from the porch while Mr. Alexander bent down to pick up a gun near the victim's body. The Defendant then turned back, waited on Mr. Alexander momentarily, and eventually fled with him to the vehicle waiting down the street.

### B.   Trial and Appeal

A Davidson County grand jury indicted the Defendant and Mr. Alexander for first degree felony murder on June 15, 2022. The case proceeded to a joint jury trial on January 21, 2024. The State called several witnesses who testified to the facts above.

Mr. Alexander testified in his own defense at trial. He stated that he and the victim were close friends and that the victim had taken a firearm from him that belonged to Mr. Alexander's father. Mr. Alexander explained that he was apprehensive about meeting the victim directly due to prior threats, so he asked the Defendant to serve as an intermediary in arranging the exchange. He further testified that he concealed himself in the bushes near the residence because he feared being seen. According to Mr. Alexander, when he confronted the victim, the victim pointed the firearm at him, and the gun discharged during a physical struggle between the two, resulting in the victim's death.

Following the close of proof, the jury convicted the Defendant of first degree felony murder. The trial court imposed a sentence of life imprisonment.

The Defendant filed a timely motion for a new trial, which the trial court denied on June 18, 2024. Twenty-three days later, the Defendant filed a timely notice of appeal. *See* Tenn. R. App. P. 4(a).

3

## STANDARD OF APPELLATE REVIEW

Our supreme court has recognized that "the first question for a reviewing court on any issue is 'what is the appropriate standard of review?'" *State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). The sole issue in this case is whether the evidence is legally sufficient to sustain the Defendant's conviction for first degree felony murder.

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023). Indeed, "[w]hen making that determination, the prosecution is afforded the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citation and internal quotation marks omitted). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citation and internal quotation marks omitted).

## ANALYSIS

On appeal, the Defendant argues that the evidence is legally insufficient to sustain her conviction for first degree felony murder. More specifically, she asserts that the evidence is legally insufficient to prove that a robbery occurred. She also contends that, even if a robbery occurred, the State failed to prove that she participated in that crime. The State responds that the evidence, when viewed in the light most favorable to the prosecution, demonstrates that the Defendant actively participated in a scheme to rob the victim, during which the victim was killed. We agree with the State.

"The first step in evaluating the sufficiency of the evidence is to identify the elements of the offense." *See State v. Rimmel*, 710 S.W.3d 640, 646 (Tenn. 2025). First degree felony murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery," among other offenses. Tenn. Code Ann. § 39-13-202(a)(2) (2018). No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony, *id.* § 39-13-202(b), and the defendant

4

"must intend to commit the underlying felony at the time the killing occurs," *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999).

Our supreme court has also recognized that "in determining whether the evidence is sufficient to support a conviction [for] first degree murder in the perpetration of [a] theft, a court must determine whether the killing is closely connected to the initial taking of the property in time, place, causation, and continuity of action." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). This is because "[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005) (citation omitted; omission in original).

Importantly, "[w]hen one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other." *State v. Winters*, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003) (citation and internal quotation marks omitted). Thus, a "defendant who is a willing and active participant in a robbery becomes accountable for all of the consequences flowing from the robbery and may be convicted of first-degree murder where a co-perpetrator of the felony is the actual killer." *State v. Middlebrooks*, 840 S.W.2d 317, 336 (Tenn. 1992).

## A.    THE COMMISSION OF A ROBBERY

In this case, the Defendant first argues that the State failed to prove that a robbery occurred. The Defendant reasons that the State's witnesses, Mr. Anthony and Ms. Broyles, never heard the Defendant and Mr. Alexander discussing their plan to rob the victim. Further, the Defendant credits Mr. Alexander's testimony that he never intended to take any item by force, but rather only sought to have the firearm that belonged to his family returned to his possession.

This argument is unavailing. Under Tennessee law, robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2018). The term "violence" is defined as "physical force that is unlawfully exercised or exerted so as to injure, damage or abuse." *State v. Fitz*, 19 S.W.3d 213, 215 (Tenn. 2000).

Mr. Anthony testified that, on the morning of the offense, Mr. Alexander texted him requesting a ride to "jack" the victim—a term Mr. Anthony later testified meant to commit a robbery. The video recording contains further evidence from which the jury could infer that Mr. Alexander used physical force to accomplish the taking of the firearm. The video

shows that when Mr. Alexander emerges from his hiding, he rushes the victim up the porch stairs, essentially tackling the victim. The two then grappled over control of the victim's weapon. According to Mr. Alexander, the firearm discharged during the course of this struggle, resulting in the victim's death. Mr. Alexander's own testimony reflects that a violent or forcible confrontation preceded the taking.

Finally, immediately after the fatal shooting, Mr. Alexander, by his own admission, took a firearm from near the victim's body before fleeing the scene. Viewed in the light most favorable to the State, this sequence of events—including the initial ambush, the physical struggle, and the immediate taking—supports the jury's conclusion that property was taken from the victim by means of violence.

Although Mr. Alexander testified that he did not intend to take the firearm by force, the jury was free to discredit his testimony and to instead credit the evidence supporting his guilt. Questions of witness credibility and the resolution of factual disputes are entrusted to the jury, and we "will not invade the province of the trier of fact by reassessing the credibility of witnesses and reweighing the evidence." *See State v. Watkins*, 648 S.W.3d 235, 256 (Tenn. Crim. App. 2021); *Curry*, 705 S.W.3d at 183. We conclude that the evidence establishes a sufficient connection of time, place, and continuity of action to show that the killing occurred in the perpetration of the robbery. *Cf. State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000). The Defendant's argument is without merit.

## B. DEFENDANT'S PARTICIPATION IN THE ROBBERY

The Defendant next argues that, even assuming a robbery did occur, the State failed to prove that she participated in the crime. She argues that the evidence does not show any affirmative act on her part and that Mr. Alexander acted alone in both the shooting and the taking of the firearm.

This argument likewise lacks merit. Here, the Defendant initiated contact with the victim under the pretense of romantic interest and arranged a meeting at a specific location, his family's residence. She assured the victim that Mr. Alexander was no longer "in the way," obtained the victim's address, and traveled to the location with Mr. Alexander. Upon arrival, she and Mr. Alexander directed Mr. Anthony to park away from the victim's residence. The Defendant then entered the home alone and remained inside with the victim for approximately thirty minutes. The video footage showed that, after emerging from the house, the Defendant positioned herself and the victim in a manner that obstructed his view of Mr. Alexander, who was concealed nearby. Moments before the shooting, she directed him toward the opposite side of the porch, placing the victim with his back turned to Mr. Alexander's concealed position.

6

After the fatal shot was fired, the Defendant waited briefly for Mr. Alexander and fled the scene with him. Her conduct before, during, and after the encounter—initiating the meeting, facilitating Mr. Alexander's concealment, and departing the scene in concert with him—supports the jury's finding that she knowingly participated in the robbery. *See State v. Middlebrooks*, 840 S.W.2d 317, 336 (Tenn. 1992); *Hinton*, 42 S.W.3d at 119 ("The evidence establishes that the defendant was an active participant in the robbery and, as such, he became accountable for all consequences flowing from the robbery."). The evidence, viewed in the light most favorable to the State, is legally sufficient to establish the Defendant's active participation in the underlying felony and, by extension, her guilt of first degree felony murder.

## CONCLUSION

In summary, we hold that the evidence is legally sufficient to support the Defendant's conviction for first degree felony murder. Accordingly, we respectfully affirm the judgment of the trial court.

s/ *Tom Greenholtz*
TOM GREENHOLTZ, JUDGE